# *Ex parte* YOUNG.

## PETITION FOR WRITS OF HABEAS. CORPUS AND CERTIORARI.

No. 10, Original. Argued December 2, 3, 1907.—Decided March 23, 1908.

While this court will not take jurisdiction if it should not, it must take jurisdiction if it should. It cannot, as the legislature may, avoid meeting a measure because it desires so to do.

In this case a suit by a stockholder against a corporation to enjoin the directors and officers from complying with the provisions of a state statute, alleged to be unconstitutional, was properly brought within Equity Rule 94 of this court.

An order of the Circuit Court committing one for contempt for violation of a decree entered in a suit of which it did not have jurisdiction is unlawful; and, in such case, upon proper application, this court will discharge the person so held.

Although the determination of whether a railway rate prescribed by a state statute is so low as to be confiscatory involves a question of fact, its solution raises a Federal question, and the sufficiency of rates is a judicial question over which the proper Circuit Court has jurisdiction, as one arising under the Constitution of the United States.

Whether a state statute is unconstitutional because the penalties for its violation are so enormous that persons affected thereby are prevented from resorting to the courts for the purpose of determining the validity of the statute and are thereby denied the equal protection of the law and their property rendered liable to be taken without due process of law, is a Federal question and gives the Circuit Court jurisdiction.

Whether the state railroad rate statute involved in this case, although on its face relating only to intrastate rates, was an interference with interstate commerce *held* to raise a Federal question which could not be considered frivolous.

A state railroad rate statute which imposes such excessive penalties that parties affected are deterred from testing its validity in the courts denies the carrier the equal protection of the law without regard to the question of insufficiency of the rates prescribed; it is within the jurisdiction, and is the duty, of the Circuit Court to inquire whether such rates are so low as to be confiscatory, and if so to permanently enjoin the railroad company, at the suit of one of its stockholders, from putting them in force, and it has power pending such inquiry to grant a temporary injunction to the same effect.

While there is no rule permitting a person to disobey a statute with impunity at least once for the purpose of testing its validity, where such validity can only be determined by judicial investigation and construction, a provision in the statute which imposes such severe penalties for disobedience of its provisions as to intimidate the parties affected thereby from resorting to the courts to test its validity practically prohibits those parties from seeking such judicial construction and denies them the equal protection of the law.

The attempt of a state officer to enforce an unconstitutional statute is a proceeding without authority of, and does not affect, the State in its sovereign or governmental capacity, and is an illegal act and the officer is stripped of his official character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to its officer immunity from responsibility to the supreme authority of the United States.

When the question of the validity of a state statute with reference to the Federal Constitution has been first raised in a Federal court that court has the right to decide it to the exclusion of all other courts.

It is not necessary that the duty of a state officer to enforce a statute be declared in that statute itself in order to permit his being joined as a party defendant from enforcing it; if by virtue of his office he has some connection with the enforcement of the act it is immaterial whether it arises by common general law or by statute.

While the courts cannot control the exercise of the discretion of an executive officer, an injunction preventing such officer from enforcing an unconstitutional statute is not an interference with his discretion.

The Attorney General of the State of Minnesota, under his common law power and the state statutes, has the general authority imposed upon him of enforcing constitutional statutes of the State and is a proper party defendant to a suit brought to prevent the enforcement of a state statute on the ground of its unconstitutionality.

While a Federal court cannot interfere in a criminal case already pending in a state court, and while, as a general rule, a court of equity cannot enjoin criminal proceedings, those rules do not apply when such proceedings are brought to enforce an alleged unconstitutional state statute, after the unconstitutionality thereof has become the subject of inquiry in a suit pending in a Federal court which has first obtained jurisdiction thereover; and under such circumstances the Federal court has the right in both civil and criminal cases to hold and maintain such jurisdiction to the exclusion of all other courts.

While making a state officer who has no connection with the enforcement of an act alleged to be unconstitutional a party defendant is merely making him a party as a representative of the State, and thereby amounts to making the State a party within the prohibition of the Eleventh Amendment, individuals, who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence an action, either civil or criminal, to enforce an unconstitutional state statute may be enjoined from so doing by a Federal court.

Under such conditions as are involved in this case the Federal court may enjoin an individual or a state officer from enforcing a state statute on account of its unconstitutionality, but it may not restrain the state court from acting in any case brought before it either of a civil or criminal nature, or prevent any investigation or action by a grand jury.

An injunction by a Federal court against a state court would violate the whole scheme of this Government, and it does not follow that because an individual may be enjoined from doing certain things a court may be similarly enjoined.

No adequate remedy at law, sufficient to prevent a court of equity from acting, exists in a case where the enforcement of an unconstitutional state rate statute would require the complainant to carry merchandise at confiscatory rates if it complied with the statute and subject it to excessive penalties in case it did not comply therewith and its validity was finally sustained.

While a common carrier sued at common law for penalties under, or on indictment for violation of, a state rate statute might interpose as a defense the unconstitutionality of the statute on account of the confiscatory character of the rates prescribed, a jury cannot intelligently pass upon such a matter; the proper method is to determine the constitutionality of the statute in a court of equity in which the opinions of experts may be

taken and the matter referred to a master to make the needed computations and to find the necessary facts on which the court may act.

A state rate statute is to be regarded as *prima facie* valid, and the *onus* rests on the carrier to prove the contrary.

The railroad interests of this country are of great magnitude, and the thousands of persons interested therein are entitled to protection from the laws and from the courts equally with the owners of all other kinds of property, and the courts having jurisdiction, whether Federal or state, should at all times be open to them, and where there is no adequate remedy at law the proper course to protect their rights is by suit in equity in which all interested parties are made defendants.

While injunctions against the enforcement of a state rate statute should not be granted by a Federal court except in a case reasonably free from doubt, the equity jurisdiction of the Federal court has been constantly exercised for such purpose.

The Circuit Court of the United States having, in an action brought by a stockholder of the Northern Pacific Railway Company against the officers of the road, certain shippers and the Attorney General and certain other officials of the State of Minnesota, held that a railroad rate statute of Minnesota was unconstitutional and enjoined all the defendants from enforcing such statute, and the Attorney General having refused to comply with such order, the Circuit Court fined and committed him for contempt, and this court refused to discharge him on *habeas corpus*.

An original application was made to this court for leave to file a petition for writs of *habeas corpus* and certiorari in behalf of Edward T. Young, petitioner, as Attorney General of the State of Minnesota.

Leave was granted and a rule entered directing the United States marshal for the District of Minnesota, Third Division, who held the petitioner in his custody, to show cause why such petition should not be granted.

The marshal, upon the return of the order to show cause, justified his detention of the petitioner by virtue of an order of the Circuit Court of the United States for the District of Minnesota, which adjudged the petitioner guilty of contempt of that court and directed that he be fined the sum of $100, and that he should dismiss the mandamus proceedings brought by him in the name and behalf of the State in the Circuit Court of the State, and that he should stand committed to the custody of the marshal until that order was obeyed. The case

involves the validity of the order of the Circuit Court committing him for contempt.

The facts are these: The legislature of the State of Minnesota duly created a railroad and warehouse commission, and that commission on the sixth of September, 1906, made an order fixing the rates for the various railroad companies for the carriage of merchandise between stations in that State of the kind and classes specified in what is known as the "Western Classification." These rates materially reduced those then existing, and were by the order to take effect November 15, 1906. In obedience to the order the railroads filed and published the schedules of rates, which have ever since that time been carried out by the companies.

At the time of the making of the above order it was provided by the Revised Laws of Minnesota, 1905 (§ 1987), that any common carrier who violated the provisions of that section or willfully suffered any such unlawful act or omission, when no specific penalty is imposed therefor, "if a natural person, shall be guilty of a gross misdemeanor, and shall be punished by a fine of not less than twenty-five hundred dollars, nor more than five thousand dollars for the first offense, and not less than five thousand dollars nor more than ten thousand dollars for each subsequent offense; and, if such carrier or warehouseman be a corporation, it shall forfeit to the State for the first offense not less than twenty-five hundred dollars nor more than five thousand dollars, and for each subsequent offense not less than five thousand dollars nor more than ten thousand dollars, to be recovered in a civil action."

This provision covered disobedience to the orders of the Commission.

On the fourth of April, 1907, the legislature of the State of Minnesota passed an act fixing two cents a mile as the maximum passenger rate to be charged by railroads in Minnesota. (The rate had been theretofore three cents per mile.) The act was to take effect on the first of May, 1907, and was put into effect on that day by the railroad companies, and the same

has been observed by them up to the present time. It was provided in the act that "Any railroad company, or any officer, agent or representative thereof, who shall violate any provision of this act shall be guilty of a felony and, upon conviction thereof, shall be punished by a fine not exceeding five thousand (5,000) dollars, or by imprisonment in the State prison for a period not exceeding five (5) years, or both such fine and imprisonment."

On the eighteenth of April, 1907, the legislature passed an act (chapter 232 of the laws of that year), which established rates for the transportation of certain commodities (not included in the Western Classification) between stations in that State. The act divided the commodities to which it referred into seven classes, and set forth a schedule of maximum rates for each class when transported in carload lots and established the minimum weight which constituted a carload of each class.

Section 5 provided that it should not affect the power or authority of the Railroad and Warehouse Commission, except that no duty should rest upon that commission to enforce any rates specifically fixed by the act or any other statute of the State. The section further provided generally that the orders made by the Railroad and Warehouse Commission prescribing rates should be the exclusive legal maximum rates for the transportation of the commodities enumerated in the act between points within that State.

Section 6 directed that every railroad company in the State should adopt and publish and put into effect the rates specified in the statute, and that every officer, director, traffic manager or agent or employé of such railroad company should cause the adoption, publication and use by such railroad company of rates not exceeding those specified in the act; "and any officer, director or such agent or employé of any such railroad company who violates any of the provisions of this section, or who causes or counsels, advises or assists any such railroad company to violate any of the provisions of this section, shall be guilty of a misdemeanor, and may be prosecuted therefor

in any county into which its railroad extends, and in which it has a station, and upon a conviction thereof be punished by imprisonment in the county jail for a period not exceeding ninety days." The act was to take effect June 1, 1907.

The railroad companies did not obey the provisions of this act so far as concerned the adoption and publication of rates as specified therein.

On the thirty-first of May, 1907, the day before the act was to take effect, nine suits in equity were commenced in the Circuit Court of the United States for the District of Minnesota, Third Division, each suit being brought by stockholders of the particular railroad mentioned in the bill, and in each case the defendants named were the railroad company of which the complainants were, respectively, stockholders, and the members of the Railroad and Warehouse Commission, and the Attorney General of the State, Edward T. Young, and individual defendants representing the shippers of freight upon the railroad.

The order punishing Mr. Young for contempt was made in the suit in which Charles E. Perkins, a citizen of the State of Iowa, and David C. Shepard, a citizen of the State of Minnesota, were complainants, and the Northern Pacific Railway Company, a corporation organized under the laws of the State of Wisconsin, Edward T. Young, petitioner herein, and others, were parties defendant. All of the defendants, except the railway company, are citizens and residents of the State of Minnesota.

It was averred in the bill that the suit was not a collusive one to confer on the court jurisdiction of a case of which it could not otherwise have cognizance, but that the objects and purposes of the suit were to enjoin the railway company from publishing or adopting (or continuing to observe, if already adopted) the rates and tariffs prescribed and set forth in the two acts of the legislature above mentioned and in the orders of the Railroad and Warehouse Commission, and also to enjoin the other defendants from attempting to enforce such provisions, or from instituting any action or proceeding against

VOL. CCIX—9

the defendant railway company, its officers, etc., on account of any violation thereof, for the reason that the said acts and orders were and each of them was violative of the Constitution of the United States.

The bill also alleged that the orders of the Railroad Commission of September 6, 1906, May 3, 1907, the passenger rate act of April 4, 1907, and the act of April 18, 1907, reducing the tariffs and charges which the railway company had theretofore been permitted to make, were each and all of them unjust, unreasonable and confiscatory, in that they each of them would, and will if enforced, deprive complainants and the railway company of their property without due process of law, and deprive them and it of the equal protection of the laws, contrary to and in violation of the Constitution of the United States and the amendments thereof. It was also averred that the complainants had demanded of the president and managing directors of the railway company that they should cease obedience to the orders of the Commission dated September 6, 1906, and May 3, 1907, and to the acts already mentioned, and that the rates prescribed in such orders and acts should not be put into effect, and that the said corporation, its officers and directors, should institute proper suit or suits to prevent said rates (named in the orders and in the acts of the legislature) from continuing or becoming effective, as the case might be, and to have the same declared illegal; but the said corporation, its president and directors, had positively declined and refused to do so, not because they considered the rates a fair and just return upon the capital invested or that they would not be confiscatory, but because of the severity of the penalties provided for the violation of such acts and orders, and therefore they could not subject themselves to the ruinous consequences which would inevitably result from failure on their part to obey the said laws and orders, a result which no action by themselves, their stockholders or directors, could possibly prevent.

The bill further alleged that the orders of the Commission

of September, 1906, and May, 1907, and the acts of April 4, 1907, and April 18, 1907, were, in the penalties prescribed for their violation, so drastic that no owner or operator of a railway property could invoke the jurisdiction of any court to test the validity thereof, except at the risk of confiscation of its property, and the imprisonment for long terms in jails and penitentiaries of its officers, agents and employés. For this reason the complainants alleged that the above-mentioned orders and acts, and each of them, denied to the defendant railway company and its stockholders, including the complainants, the equal protection of the laws, and deprived it and them of their property without due process of law, and that each of them was, for that reason, unconstitutional and void.

The bill also contained an averment that if the railway company should fail to continue to observe and keep in force or to observe and put in force the orders of the Commission and the acts of April 4, 1907, and April 18, 1907, such failure might result in an action against the company or criminal proceedings against its officers, directors, agents or employés, subjecting the company and such officers to an endless number of actions at law and criminal proceedings; that if the company should fail to obey the order of the Commission or the acts of April 4, 1907, and April 18, 1907, the said Edward T. Young, as Attorney General of the State of Minnesota, would, as complainants were advised, and believed, institute proceedings by mandamus or otherwise against the railway company, its officers, directors, agents or employés, to enforce said orders and all the provisions thereof, and that he threatened and would take other proceedings against the company, its officers, etc., to the same end and for the same purpose, and that he would on such failure institute mandamus or other proceedings for the purpose of enforcing said acts and each thereof, and the provisions and penalties thereof. Appropriate relief by injunction against the action of the defendant Young and the railroad commission was asked for.

temporary restraining order was made by the Circuit Court, which only restrained the railway company from publishing the rates as provided for in the act of April 18, 1907, and from reducing its tariffs to the figures set forth in that act; the court refusing for the present to interfere by injunction with regard to the orders of the Commission and the act of April 4, 1907, as the railroads had already put them in operation, but it restrained Edward T. Young, Attorney General, from taking any steps against the railroads to enforce the remedies or penalties specified in the act of April 18, 1907.

Copies of the bill and the restraining order were served, among others, upon the defendant Mr. Edward T. Young, Attorney General, who appeared specially and only for the purpose of moving to dismiss the bill as to him, on the ground that the court had no jurisdiction over him as Attorney General; and he averred that the State of Minnesota had not consented, and did not consent, to the commencement of this suit against him as Attorney General of the State, which suit was in truth and effect a suit against the said State of Minnesota, contrary to the Eleventh Amendment of the Constitution of the United States.

The Attorney General also filed a demurrer to the bill, on the same grounds stated in the motion to dismiss. The motion was denied and the demurrer overruled.

Thereupon, on the twenty-third of September, 1907, the court, after a hearing of all parties and taking proofs in regard to the issues involved, ordered a temporary injunction to issue against the railway company, restraining it, pending the final hearing of the cause, from putting into effect the tariffs, rates or charges set forth in the act approved April 18, 1907. The court also enjoined the defendant Young, as Attorney General of the State of Minnesota, pending the final hearing of the cause, from taking or instituting any action or proceeding to enforce the penalties and remedies specified in the act above mentioned, or to compel obedience to that act, or compliance therewith, or any part thereof.

As the court refused to grant any preliminary injunction restraining the enforcement of the rates fixed by the Railroad and Warehouse Commission, or the passenger rates under the act of April 4, 1907, because the same had been accepted by the railroads and were in operation, the court stated that in omitting the granting of such preliminary injunction the necessity was obviated upon that hearing of determining whether the rates fixed by the Commission, or the passenger rates together or singly, were confiscatory and did not afford reasonable compensation for the service rendered and a proper allowance for the property employed, and for those reasons that question had not been considered, but inasmuch as the rates fixed by the act of April 18, 1907, had not gone into force, the court observed: "It seems to me, upon this evidence of the conditions before either of those new rates were put into effect (that is, the order of the Commission of September, 1906, or the act of April 4, 1907), and the reductions made by those rates, that if there is added the reduction which is attempted to be made by the commodity act (April 18, 1907) it will reduce the compensation received by the companies below what would be a fair compensation for the services performed, including an adequate return upon the property invested. And I think, on the whole, that a preliminary injunction should issue, in respect to the rates fixed by chapter 232 (act of April 18), talked of as the commodity rates, and that there should be no preliminary injunction as to the other rates, *although the matter as to whether they are compensatory or not is a matter which may be determined in the final determination of the action.*"

The day after the granting of this preliminary injunction the Attorney General, in violation of such injunction, filed a petition for an alternative writ of mandamus in one of the courts of the State, and obtained an order from that court, September 24, 1907, directing the alternative writ to issue as prayed for in the petition. The writ was thereafter issued and served upon the Northern Pacific Railway Company,

commanding the company, immediately after its receipt, "to adopt and publish and keep for public inspection, as provided by law, as the rates and charges to be made, demanded and maintained by you for the transportation of freight between stations in the State of Minnesota of the kind, character and class named and specified in chapter 232 of the Session Laws of the State of Minnesota for the year 1907, rates and charges which do not exceed those declared to be just and reasonable in and by the terms and provisions of said chapter 232.   .   .   ."

Upon an affidavit showing these facts the United States Circuit Court ordered Mr. Young to show cause why he should not be punished as for a contempt for his misconduct in violating the temporary injunction issued by that court in the case therein pending.

Upon the return of this order the Attorney General filed his answer, in which he set up the same objections which he had made to the jurisdiction of the court in his motion to dismiss the bill, and in his demurrer; he disclaimed any intention to treat the court with disrespect in the commencement of the proceedings referred to, but believing that the decision of the court in the action, holding that it had jurisdiction to enjoin him as Attorney General from performing his discretionary official duties, was in conflict with the Eleventh Amendment of the Constitution of the United States, as the same has been interpreted and applied by the United States Supreme Court, he believed it to be his duty as such Attorney General to commence the mandamus proceedings for and in behalf of the State, and it was in this belief that the proceedings were commenced solely for the purpose of enforcing the law of the State of Minnesota.   The order adjudging him in contempt was then made.

*Mr. Thomas D. O'Brien, Mr. Herbert S. Hadley* [1] and *Mr. Edward T. Young,* with whom *Mr. Royal A. Stone, Mr. George T. Simpson* and *Mr. Charles S. Jelly* were on the brief, for petitioner:

---

[1] Attorney General of the State of Missouri.

This court in this proceeding will determine the jurisdiction of the Circuit Court in the suit in which the order punishing for contempt was made, and if it is found that the Circuit Court had no jurisdiction in the suit, or was without power or authority to make the order enjoining the petitioner, will direct his discharge from custody.

This application does not fall within those decisions where this court has held that the case was not a proper one to be considered in proceedings under the writ of *habeas corpus* or those holding that this court may exercise its discretion in granting or withholding the writ. It is in accordance with the decision rendered in *Ex parte Yarbrough*, 110 U. S. 651. See also *Ex parte Fisk*, 113 U. S. 713; *Ex parte Wells*, 18 How. 307; *Ex parte Lange*, 18 Wall. 163; *Ex parte Rowland*, 104 U. S. 604; *Ex parte Parks*, 93 U. S. 18; *Ex parte Ayers*, 123 U. S. 443; *Ex parte Siebold*, 100 U. S. 371; *Ex parte Kearney*, 7 Wheat. 38; *Ex parte Royall*, 117 U. S. 241; *Ex parte Mayfield*, 141 U. S. 107; *Ex parte McKenzie*, 180 U. S. 536; *Delgado* v. *Chaves*, 140 U. S. 586; *Ex parte Watkins*, 3 Peters, 193.

The Circuit Court did not have jurisdiction because of diverse citizenship, and no Federal question was presented by the bill of complaint which justified the Circuit Court in assuming jurisdiction.

The sufficiency of the intrastate rates prescribed by chapter 232, did not present a question involving the construction of the Constitution of the United States. The adequacy or inadequacy of a prescribed rate is a question of fact only. *Illinois C. R. Co.* v. *Interstate Commerce Com.*, 206 U. S. 441.

Where the true meaning and construction of a constitutional provision has been settled by decisions of this court, the jurisdiction of the Circuit Court will be determined, upon a consideration of the bill of complainant, in the same manner as it would be if it appeared from all the pleadings in the case that there was no controversy as to the meaning or construction of the Constitution or law under which it is claimed the controversy arises. *Western Union Tel. Co.* v. *Ann Arbor R. Co.*,

178 U. S. 239; *Equitable Life Assurance Co.* v. *Brown*, 187 U. S.
308; *New Orleans Water Works Co.* v. *Louisiana*, 185 U. S. 336.

The construction and effect of the provisions of the Con-
stitution of the United States relied upon in the suit in the
Circuit Court are settled beyond controversy by the following
as well as many other decisions: *Munn* v. *Illinois*, 94 U. S. 113;
*C. M. & St. P. R. R.* v. *Minnesota*, 134 U. S. 418; *Wisconsin
&c. R. R.* v. *Jacobson*, 179 U. S. 287; *Covington* v. *Bridge
Co.*, 154 U. S. 204; *Houston Central Ry. Co.* v. *Mayes*, 201
U. S. 321; *Railroad Commission Cases*, 116 U. S. 307; *Dow* v.
*Beidleman*, 125 U. S. 680; *Carson* v. *Durham*, 121 U. S. 421;
*Tennessee* v. *Davis*, 100 U. S. 257; *New Orleans* v. *Benjamin*,
153 U. S. 411; *McCain* v. *Des Moines*, 174 U. S. 168; *Defiance
Water Co.* v. *City of Defiance*, 191 U. S. 184; *Hooker* v. *Los
Angeles*, 188 U. S. 314; *Shoshone Min. Co.* v. *Rutter*, 177 U. S.
505; *Blackburn* v. *Gold Min. Co.*, 175 U. S. 571; *Carson* v.
*Durham*, 121 U. S. 421; *Excelsior Wooden Pipe Co.* v. *Pacific
Bridge Co.*, 185 U. S. 282; *Minnesota* v. *Northern Securities Co.*,
194 U. S. 48; *Western Union Tel. Co.* v. *Ann Arbor R. Co.*,
178 U. S. 239; *Equitable Life Assurance Co.* v. *Brown*, 187 U. S.
308; *New Orleans Water Works Co.* v. *Louisiana*, 185 U. S. 336;
*New Orleans* v. *Water Works Co.*, 142 U. S. 79; *Hamblin* v.
*Western Land Co.*, 147 U. S. 531; *St. Joseph &c. Co.* v. *Steele*,
167 U. S. 659; *Wilson* v. *North Carolina*, 169 U. S. 586.

The Circuit Court exceeded its power and authority in mak-
ing its order that the petitioner be enjoined as Attorney Gen-
eral from taking appropriate legal proceedings to compel the
railway companies to comply with the act of April 18, 1907.

Had the Eleventh Amendment never been adopted, this
suit against the Attorney General could not be maintained,
and had he in the first instance fully submitted himself to the
jurisdiction of the Circuit Court, any order attempting to con-
trol the exercise of the executive discretion vested in him, would
be beyond the power and authority of the court.

It should not be assumed under the authority of *Chisholm*
v. *Georgia*, that in the absence of the Eleventh Amendment,

a State would be subject to all suits. In that case, it was claimed that the State was indebted to the complainant upon a money demand. The political or governmental powers of the State were in no way involved.

However, be this as it may, the decision in the *Chisholm case* was based upon the positive language of the Constitution. The Eleventh Amendment restored not only immunity of the States from suit, but secured the same immunity to each department of a State which under the Constitution thereof was made independent of the judicial power.

The authority of the Attorney General to prosecute or defend a suit in which the State is concerned is necessarily implied from the nature of his office and he may bring an action where the wrong or injury complained of affects the public. 4 Cyc. 1028–1031; *Hunt* v. *Ry. Co.*, 121 Illinois, 638; *Orton* v. *State*, 12 Wisconsin, 567; *Atty. Genl.* v. *Williams*, 174 Massachusetts, 476; *People* v. *Oakland*, 118 California, 234; *Atty. Genl.* v. *Detroit*, 26 Michigan, 262.

The Attorney General of Minnesota is, therefore, an executive officer of the State second to none in the character and importance of his duties. The name and power of the State, so far as their use in litigation is concerned, are confined to his discretion, subject to control by no other officer, except in certain cases not material here. *State* v. *Tracy*, 48 Minnesota, 497.

Under the statutes of Minnesota, the Attorney General is not required to institute criminal proceedings except on the request of the Governor. Criminal proceedings are in the first instance instituted by the attorneys for the various counties, who have the right, however, to call on the Attorney General for assistance. But when any criminal case reaches the Supreme Court of the State, it comes into the exclusive charge of the Attorney General. Therefore the injunction issued in the Circuit Court interferes with the administration of the criminal laws of the State. Such interference is beyond the power of a court of equity, except where the criminal case is

instituted by a party to a suit already pending before it of which it has jurisdiction to try the same question therein involved. *In re Sawyer*, 124 U. S. 200.

The suit in the Circuit Court against the Attorney General was in effect a suit against the State of Minnesota.

The immunity of a State from suit, as provided by the Eleventh Amendment, is not dependent upon any pecuniary interest, as contended by respondents.

Where the decree of the court can operate only upon the State and only to restrain the action of the State, the suit, no matter against whom it is brought, is in effect one against the State and in such case the pecuniary interest the State may or may not have in the result of the litigation is immaterial. *Governor of Georgia* v. *Madrazo*, 1 Pet. 110; *United States* v. *Beebe*, 127 U. S. 338; *Savings Bank* v. *United States*, 19 Wall. 227; *United States* v. *American Bell Telephone Co.*, 128 U. S. 315; *United States* v. *American Bell Telephone Co.*, 159 U. S. 548; *United States* v. *Telephone Co.*, 167 U. S. 224; *Hans* v. *Louisiana*, 134 U. S. 19. *Reagan Case*, 154 U. S. 362 and *M., K. & T. Ry. Co.* v. *Hickman*, 183 U. S. 53, discussed and distinguished.

The Circuit Court was without jurisdiction under *Fitts* v. *McGhee*, 172 U. S. 516, which cannot be distinguished, and to sustain the suit in Minnesota, it must be shown that *Fitts* v. *McGhee* has been or should be overruled.

The doctrine of that case, however, was in accordance with the previous decisions of this court. *Governor of Georgia* v. *Madrazo*, 1 Pet. 110; *Board of Liquidation* v. *McComb*, 92 U. S. 531; *Pennoyer* v. *McConnaughy*, 140 U. S. 1; *In re Ayers*, 123 U. S. 443.

The doctrine established by these cases has become the settled rule of decision. And see *Cotting* v. *Godard*, 183 U. S. 79; *Davis & Farnum Mfg. Co.* v. *Los Angeles*, 189 U. S. 207; *Barney* v. *State of New York*, 193 U. S. 430; *Gunter* v. *Atlantic Coast Line R. R. Co.*, 200 U. S. 273; *Farmers' Nat. Bank* v. *Jones*, 105 Fed. Rep. 459; *Haverhill Gas Light Co.* v. *Parker*,

109 Fed. Rep. 694; *Copper Co.* v. *Freer, Attorney General*, 127 Fed. Rep. 199; *Coneter* v. *Weir*, 127 Fed. Rep. 897; *Coulter* v. *Fargo*, 127 Fed. Rep. 912; *Hitchesen* v. *Smith*, 140 Fed. Rep. 983; *Smith* v. *Alexander*, 146 Fed. Rep. 106; *Telegraph Co.* v. *Anderson*, 154 Fed. Rep. 95.

By leave of court, *Mr. Edward B. Whitney* filed a brief herein as *amicus curiæ*, in support of petitioner's contentions as to the Eleventh Amendment. With him on this brief was *Mr. Abel E. Blackmar.*

*Mr. Charles W. Bunn, Mr. Jared How* and *Mr. J. F. McGee*, with whom *Mr. Frank B. Kellogg, Mr. Cordenio A. Severance, Mr. Robert E. Olds, Mr. Stiles W. Burr, Mr. Pierce Butler, Mr. William D. Mitchell* and *Mr. William A. Lancaster* were on the briefs, for respondent:

The objections which petitioner makes against the validity of the injunctional order are matters which cannot be inquired into on writ of *habeas corpus.*

Where the contempt, the punishment for which is under review in a *habeas corpus* proceeding, consists of the violation of an order or decree of a court, the commitment will be sustained unless it is found that the order or decree disobeyed was absolutely void because the court was wholly without jurisdiction or power to make it. The proceeding being in the nature of a collateral attack upon the order or judgment which has been disobeyed, the inquiry is limited to the question of jurisdiction. *Ex parte Watkins*, 3 Pet. 193; *In re Coy*, 127 U. S. 731, 757; *In re Wilson*, 140 U. S. 575, 583.

Among the very numerous cases which deal with this question the following are most nearly in point: *Ex parte Watkins*, 3 Pet. 193; *Ex parte Yarbrough*, 110 U. S. 651; *In re Coy*, 127 U. S. 731, 756; *In re Wilson*, 140 U. S. 575, 582; *In re Delgado*, 140 U. S. 586; *In re Schneider*, 148 U. S. 162; *In re Frederich*, 149 U. S. 70, 76; *In re Tyler*, 149 U. S. 164, 180; *In re Swan*, 150 U. S. 637, 648; *In re Chapman*, 156 U. S. 211; *In re Lennon*, 166 U. S. 548: *In re McKenzie*, 180 U. S. 536.

That the injunctional order, for violation of which the petitioner was adjudged in contempt, was not void for want of jurisdiction, and could not be ignored or disobeyed with impunity, as an absolute nullity, and is not subject to collateral attack in any form of proceeding, see *Illinois Central* v. *Adams*, 180 U. S. 28.

As to what matters are open for review upon a writ of *habeas corpus* is likewise a question of procedure; and the principles invoked in the *Adams case* are equally applicable to either question.

The case involves a Federal question sufficient to sustain jurisdiction upon that ground alone.

The penalty provisions of the law attacked are violative of the Fourteenth Amendment; as to this see *Cotting* v. *Kansas City Stock Yards Company*, 183 U. S. 79, 99–102; *Consolidated Gas Company* v. *Mayer*, 146 Fed. Rep. 150; *Ex parte Wood*, 155 Fed. Rep. 190.

The rates fixed are confiscatory and the legislation is therefore unconstitutional and void under the Fourteenth Amendment. *Hastings* v. *Ames*, 68 Fed. Rep. 726.

Neither the suit itself, nor the injunction against petitioner is within the prohibition of the Eleventh Amendment.

The doctrine of *Fitts* v. *McGhee*, 172 U. S. 516, if held applicable to the facts of the present case, is not supported by any other decision of this court, is inconsistent with the uniform current of authority, and has been overruled by later decisions of this court. *Davis & Farnum Mfg. Co.* v. *Los Angeles*, 189 U. S. 207, 218; *Dobbins* v. *Los Angeles*, 195 U. S. 223, 241. *Fitts* v. *McGhee* is also inconsistent with the subsequent case of *Prout* v. *Starr*, 188 U. S. 537, and other still more recent cases. The case of *In re Ayers*, 123 U. S. 443, is not in point and does not support the doctrine of *Fitts* v. *McGhee* in any direct sense.

The distinction between the case of *In re Ayers* and cases like the case at bar has been clearly drawn by this court itself in the case of *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 9, 10.

See also *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362; *Tindall* v. *Wesley*, 167 U. S. 204; *Starr* v. *C., R. I. & P. Ry.*, 110 Fed. Rep. 3.

The same principle of distinction is applied, in varying language and with greater or less explicitness, in a number of other cases decided since the *Ayers case*, among which are: *In re Tyler*, 149 U. S. 164; *Scott* v. *Donald*, 165 U. S. 107; *Smith* v. *Reeves*, 178 U. S. 436; *C. & N. W. Ry.* v. *Dey* (Brewer, J.), 35 Fed. Rep. 866.

The following cases deal with a state of facts like that in the case at bar and are squarely in conflict with *Fitts* v. *McGhee, supra*; in the view of that case which makes it applicable to the present situation. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362; *Smyth* v. *Ames*, 169 U. S. 466; *Prout* v. *Starr*, 188 U. S. 537; *Gunter* v. *Atlantic Coast Line*, 200 U. S. 273, 284; *Miss. R. R. Comm.* v. *Illinois Central*, 203 U. S. 335, 340.

If *Fitts* v. *McGhee* can be held applicable to the present case, then that decision is unsound in principle and ought to be overruled upon the ground that the Eleventh Amendment should not be given a construction which would tend to impair the full efficacy of the protecting clauses of the Fourteenth Amendment.

It has become the aim of some legislatures to frame their enactments with such cunning adroitness, and to hedge them about with such savage and drastic penalties, as to make it impossible to test the validity of such statutes in the courts save at a risk no prudent man would dare to assume. An apt comment upon this tendency, and upon the character of such legislation, appears in the opinion by Mr. Justice Brewer in *Cotting* v. *Kansas City Stock Yards Company*, 183 U. S. 79, 99–102.

There is but one effective protection against such legislation—the power that may be exercised by courts of equity, and especially by the Circuit Courts of the United States. If it shall be held that a state statute may be so adroitly framed that the Eleventh Amendment will bar any suit in the Federal

courts of equity jurisdiction, then no corporation nor individual will dare assume the risk of the savage punishments which may be inflicted under such acts, and legislation which flagrantly violates the provisions of the Fourteenth Amendment will be made operative for all practical purposes.

By leave of court, *Mr. Walker D. Hines* filed a brief herein in behalf of the Southern Railway Company, in support of the contentions of the respondent.

MR. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

We recognize and appreciate to the fullest extent the very great importance of this case, not only to the parties now before the court, but also to the great mass of the citizens of this country; all of whom are interested in the practical working of the courts of justice throughout the land, both Federal and state, and in the proper exercise of the jurisdiction of the Federal courts, as limited and controlled by the Federal Constitution and the laws of Congress.

That there has been room for difference of opinion with regard to such limitations the reported cases in this court bear conclusive testimony. It cannot be stated that the case before us is entirely free from any possible doubt nor that intelligent men may not differ as to the correct answer to the question we are called upon to decide.

The question of jurisdiction, whether of the Circuit Court or of this court, is frequently a delicate matter to deal with, and it is especially so in this case, where the material and most important objection to the jurisdiction of the Circuit Court is the assertion that the suit is in effect against one of the States of the Union. It is a question, however, which we are called upon, and which it is our duty, to decide. Under these circumstances, the language of Chief Justice Marshall in *Cohens* v. *Virginia*, 6 Wheat. 264, 404, is most apposite. In that case he said:

"It is most true that this court will not take jurisdiction if it should not; but it is equally true that it must take jurisdiction if it should. The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the Constitution. We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given. The one or the other would be treason to the Constitution. Questions may occur which we would gladly avoid, but we cannot avoid them. All we can do is to exercise our best judgment, and conscientiously perform our duty."

Coming to a consideration of the case, we find that the complainants in the suit commenced in the Circuit Court were stockholders in the Northern Pacific Railway Company, and the reason for commencing it and making the railroad company one of the parties defendant is sufficiently set forth in the bill. *Davis &c. Co.* v. *Los Angeles,* 189 U. S. 207, 220; Equity Rule 94, Supreme Court.

It is primarily asserted on the part of the petitioner that jurisdiction did not exist in the Circuit Court because there was not the requisite diversity of citizenship, and there was no question arising under the Constitution or laws of the United States to otherwise give jurisdiction to that court. There is no claim made here of jurisdiction on the ground of diversity of citizenship, and the claim, if made, would be unfounded in fact. If no other ground exists, then the order of the Circuit Court, assuming to punish petitioner for contempt, was an unlawful order, made by a court without jurisdiction. In such case this court, upon proper application, will discharge the person from imprisonment. *Ex parte Yarbrough,* 110 U. S. 651; *Ex parte Fisk,* 113 U. S. 713; *In re Ayers,* 123 U. S. 443, 485. But an examination of the record before us shows that there are Federal questions in this case.

It is insisted by the petitioner that there is no Federal ques-

tion presented under the Fourteenth Amendment, because
there is no dispute as to the meaning of the Constitution, where
it provides that no State shall deprive any person of life,
liberty or property without due process of law; nor deny to
any person within its jurisdiction the equal protection of the
laws, and whatever dispute there may be in this case is one
of fact simply; whether the freight or passenger rates as fixed
by the legislature or by the railroad commission are so low as
to be confiscatory, and that is not a Federal question.

Jurisdiction is given to the Circuit Court in suits involving
the requisite amount, arising under the Constitution or laws
of the United States (1 U. S. Comp. Stat. p. 508), and the ques-
tion really to be determined under this objection is whether
the acts of the legislature and the orders of the railroad com-
mission, if enforced, would take property without due process
of law, and although that question might incidentally involve
a question of fact. its solution nevertheless is one which raises
a Federal question. See *Hastings* v. *Ames* (C. C. A. 8th Cir-
cuit), 68 Fed. Rep. 726. The sufficiency of rates with ref-
erence to the Federal Constitution is a judicial question, and
one over which Federal courts have jurisdiction by reason of
its Federal nature. *Chicago &c. R. R. Co.* v. *Minnesota,* 134
U. S. 418; *Reagan* v. *Farmers' &c. Co.,* 154 U. S. 369, 399;
*St. Louis &c. Co.* v. *Gill,* 156 U. S. 649; *Covington &c. Turn-
pike Road Company* v. *Sandford,* 164 U. S. 578; *Smyth* v. *Ames,*
169 U. S. 466, 522; *Chicago &c. Railway Co.* v. *Tompkins,* 176
U. S. 167, 172.

Another Federal question is the alleged unconstitutionality
of these acts because of the enormous penalties denounced for
their violation, which prevent the railway company, as al-
leged, or any of its servants or employés, from resorting to
the courts for the purpose of determining the validity of such
acts. The contention is urged by the complainants in the
suit that the company is denied the equal protection of the
laws and its property is liable to be taken without due process
of law, because it is only allowed a hearing upon the claim of

the unconstitutionality of the acts and orders in question, at the risk, if mistaken, of being subjected to such enormous penalties, resulting in the possible confiscation of its whole property, that rather than take such risks the company would obey the laws, although such obedience might also result in the end (though by a slower process) in such confiscation.

Still another Federal question is urged, growing out of the assertion that the laws are, by their necessary effect, an interference with and a regulation of interstate commerce, the grounds for which assertion it is not now necessary to enlarge upon. The question is not, at any rate, frivolous.

We conclude that the Circuit Court had jurisdiction in the case before it, because it involved the decision of Federal questions arising under the Constitution of the United States.

Coming to the inquiry regarding the alleged invalidity of these acts, we take up the contention that they are invalid on their face on account of the penalties. For disobedience to the freight act the officers, directors, agents and employés of the company are made guilty of a misdemeanor, and upon conviction each may be punished by imprisonment in the county jail for a period not exceeding ninety days. Each violation would be a separate offense, and, therefore, might result in imprisonment of the various agents of the company who would dare disobey for a term of ninety days each for each offense. Disobedience to the passenger rate act renders the party guilty of a felony and subject to a fine not exceeding five thousand dollars or imprisonment in the state prison for a period not exceeding five years, or both fine and imprisonment. The sale of each ticket above the price permitted by the act would be a violation thereof. It would be difficult, if not impossible, for the company to obtain officers, agents or employés willing to carry on its affairs except in obedience to the act and orders in question. The company itself would also, in case of disobedience, be liable to the immense fines provided for in violating orders of the Commission. The company, in order to test the validity of the acts, must find some

agent or employé to disobey them at the risk stated. The necessary effect and result of such legislation must be to preclude a resort to the courts (either state or Federal) for the purpose of testing its validity. The officers and employés could not be expected to disobey any of the provisions of the acts or orders at the risk of such fines and penalties being imposed upon them, in case the court should decide that the law was valid. The result would be a denial of any hearing to the company. The observations upon a similar question made by Mr. Justice Brewer in *Cotting* v. *Kansas City Stock Yards Company*, 183 U. S. 79, 99, 100, 102, are very apt. At page 100 he stated: "Do the laws secure to an individual an equal protection when he is allowed to come into court and make his claim or defense subject to the condition that upon a failure to make good that claim or defense the penalty for such failure either appropriates all his property or subjects him to extravagant and unreasonable loss?" Again, at page 102, he says: "It is doubtless true that the State may impose penalties, such as will tend to compel obedience to its mandates by all, individuals or corporations, and if extreme and cumulative penalties are imposed only after there has been a final determination of the validity of the statute, the question would be very different from that here presented. But when the legislature, in an effort to prevent any inquiry of the validity of a particular statute, so burdens any challenge thereof in the courts that the party affected is necessarily constrained to submit rather than take the chances of the penalties imposed, then it becomes a serious question whether the party is not deprived of the equal protection of the laws." The question was not decided in that case, as it went off on another ground. We have the same question now before us, only the penalties are more severe in the way of fines, to which is added, in the case of officers, agents or employés of the company, the risk of imprisonment for years as a common felon. See also *Mercantile Trust Co.* v. *Texas &c. Ry. Co.*, 51 Fed. Rep. 529, 543; *Louisville &c. R. R. Co.* v. *McChord*, 103

. Fed. Rep. 216, 223; *Consolidated Gas Co.* v. *Mayer*, 146 Fed. Rep. 150, 153. In *McGahey* v. *Virginia*, 135 U. S. 662, 694, it was held that to provide a different remedy to enforce a contract, which is unreasonable, and which imposes conditions not existing when the contract was made, was to offer no remedy, and when the remedy is so onerous and impracticable as to substantially give none at all the law is invalid, although what is termed a remedy is in fact given. See also *Bronson* v. *Kinzie*, 1 How. 311, 317; *Seibert* v. *Lewis*, 122 U. S. 284. If the law be such as to make the decision of the legislature or of a commission conclusive as to the sufficiency of the rates, this court has held such a law to be unconstitutional. *Chicago &c. Railway Co.* v. *Minnesota*, 134 U. S. 418. A law which indirectly accomplishes a like result by imposing such conditions upon the right to appeal for judicial relief as works an abandonment of the right rather than face the conditions upon which it is offered or may be obtained, is also unconstitutional. It may therefore be said that when the penalties for disobedience are by fines so enormous and imprisonment so severe . as to intimidate the company and its officers from resorting to the courts to test the validity of the legislation, the result is the same as if the law in terms prohibited the company from seeking judicial construction of laws which deeply affect its rights.

It is urged that there is no principle upon which to base the claim that a person is entitled to disobey a statute at least once, for the purpose of testing its validity without subjecting himself to the penalties for disobedience provided by the statute in case it is valid. This is not an accurate statement of the case. Ordinarily a law creating offenses in the nature of misdemeanors or felonies relates to a subject over which the jurisdiction of the legislature is complete in any event. In the case, however, of the establishment of certain rates without any hearing, the validity of such rates necessarily depends upon whether they are high enough to permit at least some return upon the investment (how much it is not now

necessary to state), and an inquiry as to that fact is a proper subject of judicial investigation. If it turns out that the rates are too low for that purpose, then they are illegal. Now, to impose upon a party interested the burden of obtaining a judicial decision of such a question (no prior hearing having ever been given) only upon the condition that if unsuccessful he must suffer imprisonment and pay fines as provided in these acts, is, in effect, to close up all approaches to the courts, and thus prevent any hearing upon the question whether the rates as provided by the acts are not too low, and therefore invalid. The distinction is obvious between a case where the validity of the act depends upon the existence of a fact which can be determined only after investigation of a very compli-. cated and technical character, and the ordinary case of a statute upon a subject requiring no such investigation and over which the jurisdiction of the legislature is complete in any event.

We hold, therefore, that the provisions of the acts relating to the enforcement of the rates, either for freight or passengers, by imposing such enormous fines and possible imprisonment as a result of an unsuccessful effort to test the validity of the laws themselves, are unconstitutional on their face, without regard to the question of the insufficiency of those rates. We also hold that the Circuit Court had jurisdiction under the cases already cited (and it was therefore its duty) to inquire whether the rates permitted by these acts or orders were too low and therefore confiscatory, and if so held, that the court then had jurisdiction to permanently enjoin the railroad company from putting them in force, and that it also had power, while the inquiry was pending, to grant a temporary injunction to the same effect.

Various affidavits were received upon the hearing before the court prior to the granting of the temporary injunction, and the hearing itself was, as appears from the opinion, full and deliberate, and the fact was found that the rates fixed by the commodity act, under the circumstances existing with

reference to the passenger rate act and the orders of the Commission, were not sufficient to be compensatory, and were in fact confiscatory, and the act was therefore unconstitutional. The injunction was thereupon granted with reference to the enforcement of the commodity act.

We have, therefore, upon this record the case of an unconstitutional act of the state legislature and an intention by the Attorney General of the State to endeavor to enforce its provisions, to the injury of the company, in compelling it, at great expense, to defend legal proceedings of a complicated and unusual character, and involving questions of vast importance to all employés and officers of the company, as well as to the company itself. The question that arises is whether there is a remedy that the parties interested may resort to, by going into a Federal court of equity, in a case involving a violation of the Federal Constitution, and obtaining a judicial investigation of the problem, and pending its solution obtain freedom from suits, civil or criminal, by a temporary injunction, and if the question be finally decided favorably to the contention of the company, a permanent injunction restraining all such actions or proceedings.

This inquiry necessitates an examination of the most material and important objection made to the jurisdiction of the Circuit Court, the objection being that the suit is, in effect, one against the State of Minnesota, and that the injunction issued against the Attorney General illegally prohibits state action, either criminal or civil, to enforce obedience to the statutes of the State. This objection is to be considered with reference to the Eleventh and Fourteenth Amendments to the Federal Constitution. The Eleventh Amendment prohibits the commencement or prosecution of any suit against one of the United States by citizens of another State or citizens or subjects of any foreign State. The Fourteenth Amendment provides that no State shall deprive any person of life, liberty or property without due process of law, nor shall it deny to any person within its jurisdiction the equal protection of the laws.

The case before the, Circuit Court proceeded upon the theory that the orders and acts heretofore mentioned would, if enforced, violate rights of the complainants protected by the latter Amendment. We think that whatever the rights of complainants may be, they are largely founded upon that Amendment, but a decision of this case does not require an examination or decision of the question whether its adoption in any way altered or limited the effect of the earlier Amendment. We may assume that each exists in full force, and that we must give to the Eleventh Amendment all the effect it naturally would have, without cutting it down or rendering its meaning any more narrow than the language, fairly interpreted, would warrant. It applies to a suit brought against a State by one of its own citizens as well as to a suit brought by a citizen of another State. *Hans* v. *Louisiana*, 134 U. S. 1. It was adopted after the decision of this court in *Chisholm* v. *Georgia* (1793), 2 Dall. 419 where it was held that a State might be sued by a citizen of another State. Since that time there have been many cases decided in this court involving the Eleventh Amendment, among them being *Osborn* v. *United States Bank* (1824), 9 Wheat. 738, 846, 857, which held that the Amendment applied only to those suits in which the State was a party on the record. In the subsequent case of *Governor of Georgia* v. *Madrazo* (1828), 1 Pet. 110, 122, 123, that holding was somewhat enlarged, and Chief Justice Marshall, delivering the opinion of the court, while citing *Osborn* v. *United States Bank, supra*, said that where the claim was made, as in the case then before the court, against the Governor of Georgia as governor, and the demand was made upon him, not personally, but officially (for moneys in the treasury of the State and for slaves in possession of the state government), the State might be considered as the party on the record (page 123), and therefore the suit could not be maintained.

*Davis* v. *Gray*, 16 Wall. 203, 220, reiterates the rule of *Osborn* v. *United States Bank*, so far as concerns the right to enjoin a state officer from executing a state law in conflict with

the Constitution or a statute of the United States, when such execution will violate the rights of the complainant.

In *Virginia Coupon Cases,* 114 U. S. 270, 296 (*Poindexter* v. *Greenhow*), it was adjudged that a suit against a tax collector who had refused coupons in payment of taxes, and, under color of a void law, was about to seize and sell the property of a taxpayer for non-payment of his taxes, was a suit against him personally as a wrongdoer and not against the State.

*Hagood* v. *Southern,* 117 U. S. 52, 67, decided that the bill was in substance a bill for the specific performance of a contract between the complainants and the State of South Carolina, and, although the State was not in name made a party defendant, yet being the actual party to the alleged contract the performance of which was sought and the only party by whom it could be performed, the State was, in effect, a party to the suit, and it could not be maintained for that reason. The things required to be done by the actual defendants were the very things which when done would constitute a performance of the alleged contract by the State.

The cases upon the subject were reviewed, and it was held, *In re Ayers,* 123 U. S. 443, that a bill in equity brought against officers of a State, who, as individuals, have no personal interest in the subject-matter of the suit, and defend only as representing the State, where the relief prayed for, if done, would constitute a performance by the State of the alleged contract of the State, was a suit against the State (page 504), following in this respect *Hagood* v. *Southern, supra.*

A suit of such a nature was simply an attempt to make the State itself, through its officers, perform its alleged contract, by directing those officers to do acts which constituted such performance. The State alone had any interest in the question, and a decree in favor of plaintiff would affect the treasury of the State.

On the other hand, *United States* v. *Lee,* 106 U. S. 196, determined that an individual in possession of real estate under the Government of the United States, which claimed to be

its owner, was, nevertheless, properly sued by the plaintiff, as owner, to recover possession, and such suit was not one against the United States, although the individual in possession justified such possession under its authority.    See also *Tindal* v. *Wesley*, 167 U. S. 204, to the same effect.

In *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 9, a suit against land commissioners of the State was said not to be against the State, although the complainants sought to restrain the defendants, officials of the State, from violating, under an unconstitutional act, the complainants' contract with the State, and thereby working irreparable damage to the property rights of the complainants.   *Osborn* v. *United States Bank, supra*, was cited, and it was stated: "But the general doctrine of *Osborn* v. *Bank of the United States*, that the Circuit Courts of the United States will restrain a state officer from executing an unconstitutional statute of the State, when to execute it would violate rights and privileges of the complainant which had been guaranteed by the Constitution, and would work irreparable damage and injury to him, has never been departed from.   The same principle is decided in *Scott* v. *Donald*, 165 U. S. 58, 67.   And see *Missouri &c.* v. *Missouri Railroad Commissioners*, 183 U. S. 53.

The cases above cited do not include one exactly like this under discussion.   They serve to illustrate the principles upon which many cases have been decided.   We have not cited all the cases, as we have not thought it necessary.   But the injunction asked for in the *Ayers Case*, 123 U. S. (*supra*), was to restrain the state officers from commencing suits under the act of May 12, 1887 (alleged to be unconstitutional), in the name of the State and brought to recover taxes for its use, on the ground that if such suits were commenced they would be a breach of a contract with the State.   The injunction was declared illegal because the suit itself could not be entertained as it was one against the State to enforce its alleged contract. It was said, however, that if the court had power to entertain such a suit, it would have power to grant the restraining order

preventing the commencement of suits. (Page 487.) It was not stated that the suit or the injunction was necessarily confined to a case of a threatened direct trespass upon or injury to property.

Whether the commencement of a suit could ever be regarded as an actionable injury to another, equivalent in some cases to a trespass such as is set forth in some of the foregoing cases, has received attention in the rate cases, so called. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362 (a rate case), was a suit against the members of a railroad commission (created under an act of the State of Texas) and the Attorney General, all of whom were held suable, and that such suit was not one against the State. The Commission was enjoined from enforcing the rates it had established under the act, and the Attorney General was enjoined from instituting suits to recover penalties for failing to conform to the rates fixed by the Commission under such act. It is true the statute in that case creating the board provided that suit might be maintained by any dissatisfied railroad company, or other party in interest, in a court of competent jurisdiction in Travis County, Texas, against the Commission as defendant. This court held that such language permitted a suit in the United States Circuit Court for the Western District of Texas, which embraced Travis County, but it also held that, irrespective of that consent, the suit was not in effect a suit against the State (although the Attorney General was enjoined), and therefore not prohibited under the amendment. It was said in the opinion, which was delivered by Mr. Justice Brewer, that the suit could not in any fair sense be considered a suit against the State (page 392), and the conclusion of the court was that the objection to the jurisdiction of the Circuit Court was not tenable, whether that jurisdiction was rested (page 393), "upon the provisions of the statute or upon the general jurisdiction of the court existing by virtue of the statutes of Congress and the sanction of the Constitution of the United States." Each of these grounds is effective and both are of equal force.

*Union Pacific &c.* v. *Mason City Company,* 199 U. S. 160, 166.

In *Smyth* v. *Ames,* 169 U. S. 466 (another rate case), it was again held that a suit against individuals, for the purpose of preventing them, as officers of the State, from enforcing, by the commencement of suits or by indictment, an unconstitutional enactment to the injury of the rights of the plaintiff, was not a suit against a State within the meaning of the Amendment. At page 518, in answer to the objection that the suit was really against the State, it was said: "It is the settled doctrine of this court that a suit against individuals for the purpose of preventing them as officers of a State from enforcing an unconstitutional enactment to the injury of the rights of the plaintiff, is not a suit against the State within the meaning of that Amendment." The suit was to enjoin the enforcement of a statute of Nebraska because it was alleged to be unconstitutional, on account of the rates being too low to afford some compensation to the company, and contrary, therefore, to the Fourteenth Amendment.

There was no special provision in the statute as to rates, making it the duty of the Attorney General to enforce it, but under his general powers he had authority to ask for a mandamus to enforce such or any other law. *State of Nebraska ex rel. &c.* v. *The Fremont &c. Railroad Co.,* 22 Nebraska, 313.

The final decree enjoined the Attorney General from bringing any suit (page 477) by way of injunction, mandamus, civil action or indictment, for the purpose of enforcing the provisions of the act. The fifth section of the act provided that an action might be brought by a railroad company in the Supreme Court of the State of Nebraska; but this court did not base its decision on that section when it held that a suit of the nature of that before it was not a suit against a State, although brought against individual state officers for the purpose of enjoining them from enforcing, either by civil proceeding or indictment, an unconstitutional enactment to the injury of the plaintiff's right. (Page 518.)

This decision was reaffirmed in *Prout* v. *Starr*, 188 U. S. 537, 542.

Attention is also directed to the case of *Missouri &c. Rwy. Co.* v. *Missouri R. R. &c. Commissioners*, 183 U. S. 53. That was a suit brought in a state court of Missouri by the railroad commissioners of the State, who had the powers granted them by the statutes set forth in the report. Their suit was against the railway company to compel it to discontinue certain charges it was making for crossing the Boonville bridge over the Missouri River. The defendant sought to remove the case to the Federal court, which the plaintiffs resisted, and the state court refused to remove on the ground that the real plaintiff was the State of Missouri, and it was proper to go behind the face of the record to determine that fact. In regular manner the case came here, and this court held that the State was not the real party plaintiff, and the case had therefore been properly removed from the state court, whose judgment was thereupon reversed.

Applying the same principles of construction to the removal act which had been applied to the Eleventh Amendment, it was said by this court that the State might be the real party plaintiff when the relief sought enures to it alone, and in whose favor the judgment or decree, if for the plaintiff, will effectively operate.

Although the case is one arising under the removal act and does not involve the Eleventh Amendment, it nevertheless illustrates the question now before us, and reiterates the doctrine that the State is not a party to a suit simply because the State Railroad Commission is such party.

The doctrine of *Smyth* v. *Ames* is also referred to and reiterated in *Gunter, Attorney General,* v. *Atlantic &c. Railroad Co.*, 200 U. S. 273, 283. See also *McNeill* v. *Southern Railway*, 202 U. S. 543–559; *Mississippi Railroad Commission* v. *Illinois &c. Railroad Co.*, 203 U. S. 335, 340.

The various authorities we have referred to furnish ample justification for the assertion that individuals, who, as officers

of the State, are clothed with some duty in regard to the enforcement of the laws of the State, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

It is objected, however, that *Fitts* v. *McGhee*, 172 U. S. 516, has somewhat limited this principle, and that, upon the authority of that case, it must be held that the State was a party to the suit in the United States Circuit Court, and the bill should have been dismissed as to the Attorney General on that ground.

We do not think such contention is well founded. The doctrine of *Smyth* v. *Ames* was neither overruled nor doubted in the *Fitts case*. In that case the Alabama legislature, by the act of 1895, fixed the tolls to be charged for crossing the bridge. The penalties for disobeying that act, by demanding and receiving higher tolls, were to be collected by the persons paying them. No officer of the State had any official connection with the recovery of such penalties. The indictments mentioned were found under another state statute, set forth at page 520 of the report of the case, which provided a fine against an officer of a company for taking any greater rate of toll than was authorized by its charter, or, if the charter did not specify the amount, then the fine was imposed for charging any unreasonable toll, to be determined by a jury. This act was not claimed to be unconstitutional, and the indictments found under it were not necessarily connected with the alleged unconstitutional act fixing the tolls. As no state officer who was made a party bore any close official connection with the act fixing the tolls, the making of such officer a party defendant was a simple effort to test the constitutionality of such act in that way, and there is no principle upon which it could be done. A state superintendent of schools might as well have been made a party. In the light of this fact it was said in the opinion (page 530):

"In the present case, as we have said, neither of the State officers named held any special relation to the particular statute alleged to be unconstitutional. They were not expressly directed to see to its enforcement. If, because they were law officers of the State, a case could be made for the purpose of testing the constitutionality of the statute, by an injunction suit brought against them, then the constitutionality of every act passed by the legislature could be tested by a suit against the governor and the attorney general, based upon the theory that the former, as the executive of the State was, in a general sense, charged with the execution of all its laws, and the latter, as attorney general, might represent the State in litigation involving the enforcement of its statutes. That would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law which may be raised by individuals, but it is a mode which cannot be applied to the States of the Union consistently with the fundamental principle that they cannot, without their assent, be brought into any court at the suit of private persons."

In making an officer of the State a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional it is plain that such officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party.

It has not, however, been held that it was necessary that such duty should be declared in the same act which is to be enforced. In some cases, it is true, the duty of enforcement has been so imposed (154 U. S. 362, 366, § 19 of the act), but that may possibly make the duty more clear; if it otherwise exist it is equally efficacious. The fact that the state officer by virtue of his office has some connection with the enforcement of the act is the important and material fact, and whether it arises out of the general law, or is specially created by the act itself, is not material so long as it exists.

In the course of the opinion in the *Fitts case* the *Reagan* and

*Smyth cases* were referred to (with others) as instances of state officers specially charged with the execution of a state enactment alleged to be unconstitutional, and who commit under its authority some specific wrong or trespass to the injury of plaintiff's rights. In those cases the only wrong or injury or trespass involved was the threatened commencement of suits to enforce the statute as to rates, and the threat of such commencement was in each case regarded as sufficient to authorize the issuing of an injunction to prevent the same. The threat to commence those suits under such circumstances was therefore necessarily held to be equivalent to any other threatened wrong or injury to the property of a plaintiff which had theretofore been held sufficient to authorize the suit against the officer. The being specially charged with the duty to enforce the statute is sufficiently apparent when such duty exists under the general authority of some law, even though such authority is not to be found in the particular act. It might exist by reason of the general duties of the officer to enforce it as a law of the State.

The officers in the *Fitts case* occupied the position of having no duty at all with regard to the act, and could not be properly made parties to the suit for the reason stated.

It is also objected that as the statute does not specifically make it the duty of the Attorney General (assuming he has that general right) to enforce it, he has under such circumstances a full general discretion whether to attempt its enforcement or not, and the court cannot interfere to control him as Attorney General in the exercise of his discretion.

In our view there is no interference with his discretion under the facts herein. There is no doubt that the court cannot control the exercise of the discretion of an officer. It can only direct affirmative action where the officer having some duty to perform not involving discretion, but merely ministerial in its nature, refuses or neglects to take such action. In that case the court can direct the defendant to perform this merely ministerial duty. *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541.

The general discretion regarding the enforcement of the laws when and as he deems appropriate is not interfered with by an injunction which restrains the state officer from taking any steps towards the enforcement of an unconstitutional enactment to the injury of complainant. In such case no affirmative action of any nature is directed, and the officer is simply prohibited from doing an act which he had no legal right to do. An injunction to prevent him from doing that which he has no legal right to do is not an interference with the discretion of an officer.

It is also argued that the only proceeding which the Attorney General could take to enforce the statute, so far as his office is concerned, was one by mandamus, which would be commenced by the State in its sovereign and governmental character, and that the right to bring such action is a necessary attribute of a sovereign government. It is contended that the complainants do not complain and they care nothing about any action which Mr. Young might take or bring as an ordinary individual, but that he was complained of as an officer, to whose discretion is confided the use of the name of the State of Minnesota so far as litigation is concerned, and that when or how he shall use it is a matter resting in his discretion and cannot be controlled by any court.

The answer to all this is the same as made in every case where an official claims to be acting under the authority of the State. The act to be enforced is alleged to be unconstitutional, and if it be so, the use of the name of the State to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of and one which does not affect the State in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting by the use of the name of the State to enforce a legislative enactment which is void because unconstitutional. If the act which the state Attorney General seeks to enforce be a violation of the Federal Constitution, the officer in proceeding under such enactment comes into conflict with the

superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct. The State has no power to impart to him any immunity from responsibility to the supreme authority of the United States. See *In re Ayers, supra*, page 507. It would be an injury to complainant to harass it with a multiplicity of suits or litigation generally in an endeavor to enforce penalties under an unconstitutional enactment, and to prevent it ought to be within the jurisdiction of a court of equity. If the question of unconstitutionality with reference, at least, to the Federal Constitution be first raised in a Federal court that court, as we think is shown by the authorities cited hereafter, has the right to decide it to the exclusion of all other courts.

The question remains whether the Attorney General had, by the law of the State, so far as concerns these rate acts, any duty with regard to the enforcement of the same. By his official conduct it seems that he regarded it as a duty connected with his office to compel the company to obey the commodity act, for he commenced proceedings to enforce such obedience immediately after the injunction issued, at the risk of being found guilty of contempt by so doing.

The duties of the Attorney General, as decided by the Supreme Court of the State of Minnesota, are created partly by statute and exist partly as at common law. *State ex rel. Young, Attorney General*, v. *Robinson* (decided June 7, 1907), 112 N. W. Rep. 269. In the above-cited case it was held that the Attorney General might institute, conduct and maintain all suits and proceedings he might deem necessary for the enforcement of the laws of the State, the preservation of order and the protection of public rights, and that there were no statutory restrictions in that State limiting the duties of the Attorney General in such case.

Section 3 of chapter 227 of the General Laws of Minnesota, 1905 (same law, § 58, Revised Laws of Minnesota, 1905),

imposes the duty upon the Attorney General to cause proceedings to be instituted against any corporation whenever it shall have offended against the laws of the State. By § 1960 of the Revised Laws of 1905 it is also provided that the Attorney General shall be *ex officio* attorney for the railroad commission and it is made his duty to institute and prosecute all actions which the Commission shall order brought, and shall render the commissioners all counsel and advice necessary for the proper performance of their duties.

It is said that the Attorney General is only bound to act when the Commission orders action to be brought, and that § 5 of the commodity act (April 18, 1907) expressly provides that no duty shall rest upon the Commission to enforce the act, and hence no duty other than that which is discretionary rests upon the Attorney General in that matter. The provision is somewhat unusual, but the reasons for its insertion in that act are not material, and neither require nor justify comment by this court.

It would seem to be clear that the Attorney General, under his power existing at common law and by virtue of these various statutes, had a general duty imposed upon him, which includes the right and the power to enforce the statutes of the State, including, of course, the act in question, if it were constitutional. His power by virtue of his office sufficiently connected him with the duty of enforcement to make him a proper party to a suit of the nature of the one now before the United States Circuit Court.

It is further objected (and the objection really forms part of the contention that the State cannot be sued) that a court of equity has no jurisdiction to enjoin criminal proceedings, by indictment or otherwise, under the state law. This, as a general rule, is true. But there are exceptions. When such indictment or proceeding is brought to enforce an alleged unconstitutional statute, which is the subject matter of inquiry in a suit already pending in a Federal court, the latter court having first obtained jurisdiction over the subject matter, has

the right, in both civil and criminal cases, to hold and maintain such jurisdiction, to the exclusion of all other courts, until its duty is fully performed. *Prout* v. *Starr*, 188 U. S. 537, 544. But the Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court. *Taylor* v. *Taintor*, 16 Wall. 366, 370; *Harkrader* v. *Wadley*, 172 U. S. 148.

Where one commences a criminal proceeding who is already party to a suit then pending in a court of equity, if the criminal proceedings are brought to enforce the same right that is in issue before that court, the latter may enjoin such criminal proceedings. *Davis &c. Co.* v. *Los Angeles*, 189 U. S. 207. In *Dobbins* v. *Los Angeles*, 195 U. S. 223–241, it is remarked by Mr. Justice Day, in delivering the opinion of the court, that "it is well settled that where property rights will be destroyed, unlawful interference by criminal proceedings under a void law or ordinance may be reached and controlled by a court of equity." *Smyth* v. *Ames* (*supra*) distinctly enjoined the proceedings by indictment to compel obedience to the rate act.

These cases show that a court of equity is not always precluded from granting an injunction to stay proceedings in criminal cases, and we have no doubt the principle applies in a case such as the present. *In re Sawyer*, 124 U. S. 200, 211, is not to the contrary. That case holds that in general a court of equity has no jurisdiction of a bill to stay criminal proceedings, but it expressly states an exception, "unless they are instituted by a party to the suit already pending before it and to try the same right that is in issue there." Various authorities are cited to sustain the exception. The criminal proceedings here that could be commenced by the state authorities would be under the statutes relating to passenger or freight rates, and their validity is the very question involved in the suit in the United States Circuit Court. The right to restrain proceedings by mandamus is based upon the same foundation and governed by the same principles.

It is proper to add that the right to enjoin an individual, even though a state official, from commencing suits under circumstances already stated, does not include the power to restrain a court from acting in any case brought before it, either of a civil or criminal nature, nor does it include power to prevent any investigation or action by a grand jury. The latter body is part of the machinery of a criminal court, and an injunction against a state court would be a violation of the whole scheme of our Government. If an injunction against an individual is disobeyed, and he commences proceedings before a grand jury or in a court, such disobedience is personal only, and the court or jury can proceed without incurring any penalty on that account.

The difference between the power to enjoin an individual from doing certain things, and the power to enjoin courts from proceeding in their own way to exercise jurisdiction is plain, and no power to do the latter exists because of a power to do the former.

It is further objected that there is a plain and adequate remedy at law open to the complainants and that a court of equity, therefore, has no jurisdiction in such case. It has been suggested that the proper way to test the constitutionality of the act is to disobey it, at least once, after which the company might obey the act pending subsequent proceedings to test its validity. But in the event of a single violation the prosecutor might not avail himself of the opportunity to make the test, as obedience to the law was thereafter continued, and he might think it unnecessary to start an inquiry. If, however, he should do so while the company was thereafter obeying the law, several years might elapse before there was a final determination of the question, and if it should be determined that the law was invalid the property of the company would have been taken during that time without due process of law, and there would be no possibility of its recovery.

Another obstacle to making the test on the part of the company might be to find an agent or employé who would disobey

the law, with a possible fine and imprisonment staring him in
the face if the act should be held valid. Take the passenger
rate act, for instance: A sale of a single ticket above the price
mentioned in that act might subject the ticket agent to a
charge of felony, and upon conviction to a fine of five thousand
dollars and imprisonment for five years. It is true the com-
pany might pay the fine, but the imprisonment the agent
would have to suffer personally. It would not be wonderful
if, under such circumstances, there would not be a crowd of
agents offering to disobey the law. The wonder would be that
a single agent should be found ready to take the risk.

If, however, one should be found and the prosecutor should
elect to proceed against him, the defense that the act was
invalid, because the rates established by it were too low,
would require a long and difficult examination of quite com-
plicated facts upon which the validity of the act depended.
Such investigation it would be almost impossible to make
before a jury, as such body could not intelligently pass upon
the matter. Questions of the cost of transportation of pas-
sengers and freight, the net earnings of the road, the separation
of the cost and earnings, within the State from those arising
beyond its boundaries, all depending upon the testimony of
experts and the examination of figures relating to these sub-
jects, as well, possibly, as the expenses attending the building
and proper cost of the road, would necessarily form the chief
matter of inquiry, and intelligent answers could only be given
after a careful and prolonged examination of the whole evi-
dence, and the making of calculations based thereon. All
material evidence having been taken upon these issues, it has
been held that it ought to be referred to the most competent
and reliable master to make all needed computations and to
find therefrom the necessary facts upon which a judgment
might be rendered that might be reviewed by this court.
*Chicago &c. Railway Co.* v. *Tompkins,* 176 U. S. 167. From
all these considerations it is plain that this is not a proper
suit for investigation by a jury. Suits for penalties, or in-

dictment or other criminal proceedings for a violation of the act, would therefore furnish no reasonable or adequate opportunity for the presentation of a defense founded upon the assertion that the rates were too low and therefore the act invalid.

We do not say the company could not interpose this defense in an action to recover penalties or upon the trial of an indictment (*St. Louis &c. Ry. Co.* v. *Gill*, 156 U. S. 649), but the facility of proving it in either case falls so far below that which would obtain in a court of equity that comparison is scarcely possible.

To await proceedings against the company in a state court grounded upon a disobedience of the act, and then, if necessary, obtain a review in this court by writ of error to the highest state court, would place the company in peril of large loss and its agents in great risk of fines and imprisonment if it should be finally determined that the act was valid. This risk the company ought not to be required to take. Over eleven thousand millions of dollars, it is estimated, are invested in railroad property, owned by many thousands of people who are scattered over the whole country from ocean to ocean, and they are entitled to equal protection from the laws and from the courts, with the owners of all other kinds of property, no more, no less. The courts having jurisdiction, Federal or state, should at all times be open to them as well as to others, for the purpose of protecting their property and their legal rights.

All the objections to a remedy at law as being plainly inadequate are obviated by a suit in equity, making all who are directly interested parties to the suit, and enjoining the enforcement of the act until the decision of the court upon the legal question.

An act of the legislature fixing rates, either for passengers or freight, is to be regarded as *prima facie* valid, and the onus rests upon the company to prove its assertion to the contrary. Under such circumstances it was stated by Mr. Justice Miller,

in his concurring opinion in *Chicago &c. Co.* v. *Minnesota*, 134
U. S. 418, 460, that the proper, if not the only, mode of ju-
dicial relief against the tariff of rates established by the leg-
islature or by its Commission is by a bill in chancery, asserting
its unreasonable character, and that until the decree of the
court in such equity suit was obtained it was not competent
for each individual having dealings with a carrier, or for the
carrier in regard to each individual who demands its services,
to raise a contest in the courts over the questions which ought
to be settled in this general and conclusive manner.  This
remedy by bill in equity is referred to and approved by Mr.
Justice Shiras, in delivering the opinion of the court in *St. Louis
&c. Co.* v. *Gill*, 156 U. S. 649, 659, 666, although that question
was not then directly before the court.  Such remedy is un-
doubtedly the most convenient, the most comprehensive and
the most orderly way in which the rights of all parties can be
properly, fairly and adequately passed upon.  It cannot be
to the real interest of anyone to injure or cripple the resources
of the railroad companies of the country, because the pros-
perity of both the railroads and the country is most intimately
connected.  The question of sufficiency of rates is important
and controlling, and being of a judicial nature it ought to be
settled at the earliest moment by some court, and when a
Federal court first obtains jurisdiction it ought, on general
principles of jurisprudence, to be permitted to finish the in-
quiry and make a conclusive judgment to the exclusion of all
other courts.  This is all that is claimed, and this, we think,
must be admitted.

Finally it is objected that the necessary result of upholding
this suit in the Circuit Court will be to draw to the lower
Federal courts a great flood of litigation of this character,
where one Federal judge would have it in his power to enjoin
proceedings by state officials to enforce the legislative acts of
the State, either by criminal or civil actions.  To this it may
be answered, in the first place, that no injunction ought to be
granted unless in a case reasonably free from doubt.  We

think such rule is, and will be, followed by all the judges of the Federal courts.

And, again, it must be remembered that jurisdiction of this general character has, in fact, been exercised by Federal courts from the time of *Osborn* v. *United States Bank* up to the present; the only difference in regard to the case of Osborn and the case in hand being that in this case the injury complained of is the threatened commencement of suits, civil or criminal, to enforce the act, instead of, as in the *Osborn case,* an actual and direct trespass upon or interference with tangible property. A bill filed to prevent the commencement of suits to enforce an unconstitutional act, under the circumstances already mentioned, is no new invention, as we have already seen. The difference between an actual and direct interference with tangible property and the enjoining of state officers from enforcing an unconstitutional act, is not of a radical nature, and does not extend, in truth, the jurisdiction of the courts over the subject matter. In the case of the interference with property the person enjoined is assuming to act in his capacity as an official of the State, and justification for his interference is claimed by reason of his position as a state official. Such official cannot so justify when acting under an unconstitutional enactment of the legislature. So, where the state official, instead of directly interfering with tangible property, is about to commence suits, which have for their object the enforcement of an act which violates the Federal Constitution, to the great and irreparable injury of the complainants, he is seeking the same justification from the authority of the State as in other cases. The sovereignty of the State is, in reality, no more involved in one case than in the other. The State cannot in either case impart to the official immunity from responsibility to the supreme authority of the United States. See *In re Ayers,* 123 U. S. 507.

This supreme authority, which arises from the specific provisions of the Constitution itself, is nowhere more fully illustrated than in the series of decisions under the Federal *habeas*

*corpus* statute (§ 753, Rev. Stat.), in some of which cases persons in the custody of state officers for alleged crimes against the State have been taken from that custody and discharged by a Federal court or judge, because the imprisonment was adjudged to be in violation of the Federal Constitution. The right to so discharge has not been doubted by this court, and it has never been supposed there was any suit against the State by reason of serving the writ upon one of the officers of the State in whose custody the person was found. In some of the cases the writ has been refused as matter of discretion, but in others it has been granted, while the power has been fully recognized in all. *Ex parte Royall,* 117 U. S. 241; *In re Loney,* 134 U. S. 372; *In re Neagle,* 135 U. S. 1; *Baker* v. *Grice,* 169 U. S. 284; *Ohio* v. *Thomas,* 173 U. S. 276; *Minnesota* v. *Brundage,* 180 U. S. 499, 502; *Reid* v. *Jones,* 187 U. S. 153; *United States* v. *Lewis,* 200 U. S. 1; *In re Lincoln,* 202 U. S. 178; *Urquhart* v. *Brown,* 205 U. S. 179.

It is somewhat difficult to appreciate the distinction which, while admitting that the taking of such a person from the custody of the State by virtue of service of the writ on the state officer in whose custody he is found, is not a suit against the State, and yet service of a writ on the Attorney General to prevent his enforcing an unconstitutional enactment of a state legislature is a suit against the State.

There is nothing in the case before us that ought properly to breed hostility to the customary operation of Federal courts of justice in cases of this character.

The rule to show cause is discharged and the petition for writs of *habeas corpus* and certiorari is dismissed.

*So ordered.*

MR. JUSTICE HARLAN, dissenting.

Although the history of this litigation is set forth in the opinion of the court, I deem it appropriate to restate the principal facts of the case in direct connection with my examination of the question upon which the decision turns.

That question is, whether the suit in the Circuit Court of the United States was, *as to the relief sought against the Attorney General of Minnesota,* forbidden by the Eleventh Amendment of the Constitution of the United States, declaring that "the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State." That examination, I may say at the outset, is entered upon with no little embarrassment, in view of the fact that the views expressed by me are not shared by my brethren. I may also frankly admit embarrassment arising from certain views stated in dissenting opinions heretofore delivered by me which did not, at the time, meet the approval of my brethren, and which I do not now myself entertain. What I shall say in this opinion will be in substantial accord with what the court has heretofore decided, while the opinion of the court departs, as I think, from principles previously announced by it upon full consideration. I propose to adhere to former decisions of the court, whatever may have been once my opinion as to certain aspects of this general question.

The plaintiffs in the suit referred to, Perkins and Shepard, were shareholders of the Northern Pacific Railway Company and citizens, respectively, of Iowa and Minnesota. The defendants were the railway company, Edward T. Young, Attorney General of Minnesota, the several members of the State Railroad and Warehouse Commission, and certain persons who were shippers of freight over the lines of that railway.

The general object of the suit was to prevent compliance with the provisions of certain acts of the Minnesota legislature and certain orders of the State Railroad and Warehouse Commission, indicating the rates which the State permits to be charged for the transportation of passengers and commodities upon railroads within its limits; also, to prevent shippers from bringing actions against the railway company to enforce those acts and orders.

The bill, among other things, prayed that Edward T. Young, "as Attorney General of the State of Minnesota," and the members of the State Railroad and Warehouse Commission (naming them) be enjoined from all attempts to compel the railway company to put in force the rates or any of them prescribed by said orders, and "from taking any action, step or proceeding against said Railway Company, or any of its officers, directors, agents or employés, to enforce any penalties or remedies for the violation by said Railway Company of said orders or either of them;" and that said Young, "as Attorney General," be enjoined from taking any action, step or proceeding against the railway company, its officers, agents or employés, to enforce the penalties and remedies specified in those acts.

The court gave a temporary injunction as prayed for. The Attorney General of Minnesota appeared specially and, without submitting to or acknowledging the jurisdiction of the court, moved to dismiss the suit as to him, upon the ground that the State had not consented to be sued, and also because the bill was exhibited against him "as, and only as, the Attorney General of the State of Minnesota," to restrain him, by injunction, from exercising the discretion vested in him to commence appropriate actions, on behalf of the State, to enforce or to test the validity of its laws. He directly raised the question that the suit as to him, in his official capacity, was one against the State, in violation of the Eleventh Amendment.

In response to an order to show cause why the injunction asked for should not be granted the Attorney General also appeared specially and urged like objections to the suit against him in the Circuit Court.

After hearing the parties the court made an order, September 23, 1907, whereby the railway company, its officers, directors, agents, servants and employés, were enjoined until the further order of the court from publishing, adopting or putting into effect the tariffs, rates or charges specified in the

act of April 18, 1907. The court likewise enjoined the defendant Young, "as Attorney General of the State of Minnesota," from "taking or instituting any action, suit, step or proceeding to enforce the penalties and remedies specified in said acts or either thereof, or to compel obedience to said act or compliance therewith or any part thereof." A like injunction was granted against the defendant shippers.

On the next day, September 24, 1907, the State of Minnesota, "on the relation of Edward T. Young, Attorney General," commenced an action in one of its own courts against the Northern Pacific Railway Company—*the only relief sought* being a mandamus ordering the company to adopt, publish, keep for public inspection, and put into effect, as the rates and charges to be maintained for the transportation of freight between stations in Minnesota, those named and specified in what is known as chapter 232 of the Session Laws of Minnesota for 1907. That was the act which it was the object of the Perkins-Shepard suit in the Federal court to strike down and nullify. An alternative writ of mandamus, such as the State asked, was issued by the state court.

The institution, in the state court, by the State, on the relation of its Attorney General, of the mandamus proceeding against the railway company having been brought to the attention of the Federal Circuit Court, a rule was issued against the defendant Young to show cause why he should not be punished as for contempt. Answering that rule, he alleged, among other things, that the mandamus proceeding was brought by and on behalf of the State, through him as its Attorney General; that in every way possible he had objected to such jurisdiction on the ground that the action was commenced against him solely as the Attorney General for Minnesota in order to prevent him from instituting in the proper courts civil actions for and in the name of the State to enforce or test the validity of its laws; *that there is no other action or proceeding pending or contemplated by this defendant against said railway company, except said proceedings in mandamus*

*hereinbefore referred to.* Defendant expressly disclaimed any intention to treat this court with disrespect in the commencement of the proceedings referred to, "but believing that the decision of this court in this action, holding that it had jurisdiction to enjoin this defendant, as such Attorney General, from performing his discretionary official duties, was in conflict with the Eleventh Amendment of the Constitution of the United States, as the same has been interpreted and applied by the United States Supreme Court, defendant believed it to be his duty as such Attorney General to commence said mandamus proceedings for and in behalf of the State, and it was in this belief that said proceedings were commenced solely for the purpose of enforcing the said law of the State of Minnesota."

The rule was heard, and the Attorney General was held to be in contempt, the order of the Federal court being: "Ordered further, that said Edward T. Young *forthwith dismiss or cause to be dismissed the suit of The State of Minnesota* on the Relation of Edward T. Young, Attorney General, Plaintiff, *v.* Northern Pacific Railway Company, Defendant, heretofore instituted by him in the District Court of the County of Ramsey, Second Judicial District, State of Minnesota. Ordered further, that for his said contempt said Edward T. Young be fined the sum of one hundred dollars and *stand committed in the custody* of the Marshal of this court until the same be paid, and until he purge himself of his contempt by dismissing or causing to be dismissed said suit last herein mentioned."

The present proceeding was commenced by an original application by Young to this court for a writ of *habeas corpus.* The petitioner, in his application, proceeds upon the ground that he is held in custody in violation of the Constitution of the United States. The petition set out all the steps taken in the suit in the Federal court, alleging, among other things: "That your petitioner's office as Attorney General of the State of Minnesota is established and provided for by the constitution of the said State, section 1 of Article V thereof

providing as follows, to wit: 'The Executive Department shall consist of a Governor, Lieutenant Governor, Secretary of State, Auditor, Treasurer and Attorney General, who shall be chosen by the electors of the State.' That neither by statute nor otherwise is your petitioner charged with any special duty of a ministerial character in the doing or not doing of which said complainants in the said bill of complaint or the said Northern Pacific Railway Company had any legal right, and that whatever duties your petitioner had or has with respect to the several matters complained of in the said bill of complaint, are of an executive and discretionary nature. That in no case could your petitioner, even though it was his intention so to do, which it was not, deprive the said complainants or the said Northern Pacific Railway Company, or either of them, of any property, nor could he trespass upon their rights in any particular, and that all he could do *as Attorney General* as aforesaid and all that it was his duty to do in that capacity, and all that he intended to do or would do, *was to commence formal judicial proceedings in the appropriate court of Minnesota against the said Northern Pacific Railway Company, its officers, agents and employés,* to compel the said company, its agents and servants, to adopt and put in force the schedule of freight rates, tariffs and charges prescribed by said chapter 232, Laws 1907, of the State of Minnesota." He renewed the objection that the suit instituted by Perkins and Shepard, in so far as the same is against him, was a suit against the State to prevent his commencing the proposed action in the name of the State, and was in restraint of the State itself, "and that the said suit is one against the said State in violation of the Eleventh Amendment to the Constitution of the United States, and that therefore the same is and was, so far as your petitioner is concerned, beyond the jurisdiction of the said Circuit Court," etc.

This statement will sufficiently indicate the nature of the question to be now examined upon its merits.

Let it be observed that the suit instituted by Perkins and

Shepard in the Circuit Court of the United States was, as to the defendant Young, one against him *as, and only because he was,* Attorney General of Minnesota. No relief was sought against him individually but only in his capacity *as* Attorney General. And the manifest, indeed the avowed and admitted, object of seeking such relief was *to tie the hands* of the *State* so that it could not in any manner or by any mode of proceeding, *in its own courts,* test the validity of the statutes and orders in question. It would therefore seem clear that within the true meaning of the Eleventh Amendment the suit brought in the Federal court was one, in legal effect, against the State— as much so as if the State had been formally named on the record as a party—and therefore it was a suit to which, under the Amendment, so far as the State or its Attorney General was concerned, the judicial power of the United States did not and could not extend. If this proposition be sound it will follow—indeed, it is conceded that if, so far as relief is sought against the Attorney General of Minnesota, this be a suit against the State—then the order of the Federal court enjoining that officer from taking any action, suit, step or proceeding to compel the railway company to obey the Minnesota statute was beyond the jurisdiction of that court and wholly void; in which case, that officer was at liberty to proceed in the discharge of his official duties as defined by the laws of the State, and the order adjudging him to be in contempt for bringing the mandamus proceeding in the state court was a nullity.

The fact that the Federal Circuit Court had, prior to the institution of the mandamus suit in the state court, preliminarily (but not finally) held the statutes of Minnesota and the orders of its Railroad and Warehouse Commission in question to be in violation of the Constitution of the United States, was no reason why that court should have laid violent hands upon the Attorney General of Minnesota and by its orders have deprived the State of the services of its constitutional law officer in its own courts. Yet that is what was done by

the Federal Circuit Court; for, the intangible thing, called a State, however extensive its powers, can never appear or be represented or known in any court in a litigated case, except by and through its officers. When, therefore, the Federal court forbade the defendant Young, as Attorney General of Minnesota, from taking any action, suit, step or proceeding whatever looking to the enforcement of the statutes in question, it said in effect to the State of Minnesota: "It is true that the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively or to its people, and it is true that under the Constitution the judicial power of the United States does not extend to any suit brought against a State by a citizen of another State or by a citizen or subject of a foreign State, yet the Federal court adjudges that you, the State, although a sovereign for many important governmental purposes, shall not appear in your own courts, by your law officer, with the view of enforcing, or even for determining the validity of the state enactments which the Federal court has, upon a preliminary hearing, declared to be in violation of the Constitution of the United States."

This principle, if firmly established, would work a radical change in our governmental system. It would inaugurate a new era in the American judicial system and in the relations of the National and state governments. It would enable the subordinate Federal courts to supervise and control the official action of the States as if they were "dependencies" or provinces. It would place the States of the Union in a condition of inferiority never dreamed of when the Constitution was adopted or when the Eleventh Amendment was made a part of the Supreme Law of the Land. I cannot suppose that the great men who framed the Constitution ever thought the time would come when a subordinate Federal court, having no power to compel a State, in its corporate capacity, to appear before it as a litigant, would yet assume to deprive a State of the right to be represented in its own courts by its

regular law officer. That is what the court below did, as to Minnesota, when it adjudged that the appearance of the defendant Young *in the state court,* as the Attorney General of Minnesota, representing his State as its chief law officer, was a contempt of the authority of the Federal court, punishable by fine and imprisonment. Too little consequence has been attached to the fact that the courts of the States are under an obligation equally strong with that resting upon the courts of the Union to respect and enforce the provisions of the Federal Constitution as the Supreme Law of the Land, and to guard rights secured or guaranteed by that instrument. We must assume—a decent respect for the States requires us to assume—that the state courts will enforce every right secured by the Constitution. If they fail to do so, the party complaining has a clear remedy for the protection of his rights; for, he can come by writ of error, in an orderly, judicial way, from the highest court of the State to this tribunal for redress in respect of every right granted or secured by that instrument and denied by the state court. The state courts, it should be remembered, have jurisdiction concurrent with the courts of the United States of all suits of a civil nature, at common law or equity involving a prescribed amount, arising under the Constitution or laws of the United States. 25 Stat. 434. And this court has said: "A state court of original jurisdiction, having the parties before it, may consistently with existing Federal legislation determine cases at law or in equity arising under the Constitution or laws of the United States or involving rights dependent upon such Constitution or laws. Upon the state courts, equally with the courts of the Union, rests the obligation to guard, enforce, and protect every right granted or secured by the Constitution of the United States and the laws made in pursuance thereof, whenever those rights are involved in any suit or proceeding before them; for the judges of the state courts are required to take an oath to support that Constitution, and they are bound by it, and the laws of the United States made in pursuance thereof, and all treaties

made under their authority, as the supreme law of the land, 'anything in the Constitution or laws of any State to the contrary notwithstanding.' If they fail therein, and withhold or deny rights, privileges, or immunities secured by the Constitution and laws of the United States, the party aggrieved may bring the case from the highest court of the State in which the question could be decided to this court for final and conclusive determination." *Robb* v. *Connolly*, 111 U. S. 624, 637. So that an order of the Federal court preventing the State from having the services of its Attorney General in one of its own courts, except at the risk of his being fined and arrested, cannot be justified upon the ground that the question of constitutional law, involved in the enforcement of the statutes in question, was beyond the competency of a state court to consider and determine, primarily, as between the parties before it in a suit brought by the State itself.

At the argument of this case counsel for the railway company insisted that the provisions of the act in question were so drastic that they could be enforced by the State in its own courts with such persistency and in such a manner as, in a very brief period, to have the railway officers and agents all in jail, the business of the company destroyed and its property confiscated by heavy and successive penalties, before a final judicial decision as to the constitutionality of the act could be obtained. I infer from some language in the court's opinion that these apprehensions are shared by some of my brethren. And this supposed danger to the railway company and its shareholders seems to have been the basis of the action of the Federal Circuit Court when, by its order directed against the Attorney General of Minnesota, it practically excluded the State from its own courts in respect of the issues here involved But really no such question as to the state statute is here involved or need be now considered; for it cannot possibly arise on the hearing of the present application of that officer for discharge on *habeas corpus*. The only question now before this court is whether the suit by Perkins and Shepard in the Federal

court was not, upon its face, *as to the relief sought against the Attorney General of Minnesota,* a suit against the State. Stated in another form, the question is whether that court may, *by operating upon that officer in his official capacity,* by means of fine and imprisonment, prevent the State from being represented by its law officer in one of its own courts? If the Federal court could not thus put manacles upon the State so as to prevent it from being represented by its Attorney General in its own court and from having the state court pass upon the validity of the state enactment in question in the Perkins-Shepard suit, that is an end to this *habeas corpus* proceeding, and the Attorney General of Minnesota should be discharged by order of this court from custody.

It is to be observed that when the State was in effect prohibited by the order of the Federal court from appearing in its own courts, there was no danger, absolutely none whatever, from anything that the Attorney General had ever done or proposed to do, that the property of the railway company would be confiscated and its officers and agents imprisoned, beyond the power of that company to stay any wrong done *by bringing to this court, in regular order, any final judgment of the state court, in the mandamus suit, which may have been in derogation of a Federal right.* When the Attorney General instituted the mandamus proceeding in the state court against the railway company there was in force, it must not be forgotten, an order of injunction by the Federal court which prevented that company from obeying the state law. There was consequently no danger from that direction. Besides, the mandamus proceeding was not instituted for the recovery of any of the penalties prescribed by the state law, and therefore no judgment in that case could operate directly upon the property of the railway company or upon the persons of its officers or agents. The Attorney General in his response to the rule against him assured the Federal court that he did not contemplate any proceeding whatever against the railway company except the one in mandamus. Suppose the

mandamus case had been finally decided in the state court, the way was open for the railway company to preserve any question it made as to its rights under the Constitution, and, in the event of a decision adverse to it in that court, at once to carry the case to the highest court of Minnesota and thence by a writ of error bring it to this court. That course would have served to determine every question of constitutional law raised by the suit in the Federal court in an orderly way without trampling upon the State, and without interfering, in the meantime, with the operation of the railway property in the accustomed way. Instead of adopting that course—so manifestly consistent with the dignity and authority of both the Federal and state judicial tribunals—the Federal court practically closed the state courts against the State itself when it adjudged that the Attorney General, without regard to the wishes of the Governor of Minnesota, and without reference to his duties as prescribed by the laws of that State, should stand in the custody of the Marshal, unless he dismissed the mandamus suit. If the Federal court could thus prohibit the law officer of the State from representing it in a suit brought in the state court, why might not the bill in the Federal court be so amended that that court could reach all the district attorneys in Minnesota and forbid them from bringing to the attention of grand juries and the state courts violations of the state act by the railway company? And if a grand jury was about to inquire into the acts of the railway company in respect of the matter of its rates, why may not the Federal court, proceeding upon the same grounds on which it has moved against the Attorney General, enjoin the finding or returning of indictments against the railway company? If an indictment was returned against the railway company, and was about to be tried by a petit jury, why could not the Federal court, upon the principles now announced, forbid the jury to proceed against the railway company, and if it did, punish every petit juryman as for contempt of court? Indeed, why may it not lay its hands on the Governor of the State and

forbid him from appealing to the courts of Minnesota in the name of the State to test the validity of the act in question? And why may not the Federal court lay its hands even upon the judge of the state court itself, whenever it proceeds against the railway company under the state law?

The subject matter of these questions has evidently been considered by this court, and the startling consequences that would result from an affirmative answer to them have not been overlooked; for, in its opinion, I find these observations: "It is proper to add that the right to enjoin an individual, even though a state official, from commencing suits under circumstances already stated, does not include the power to restrain a court from acting in any case brought before it, either of a civil or criminal nature, nor does it include power to prevent any investigation or action by a grand jury. The latter body is part of the machinery of a criminal court, and an injunction against a state court would be a violation *of the whole scheme of our government.* If an injunction against an individual is disobeyed, and he commences proceedings before a grand jury or in a court, such disobedience is personal only, and the court or jury can proceed without incurring any penalty on that account. The difference between the power to enjoin an individual from doing certain things, and the power to enjoin courts from proceeding in their own way to exercise jurisdiction is plain, and no power to do the latter exists because of a power to do the former." If an order of the Federal court forbidding a state court or its grand jury from attempting to enforce a state enactment would be "a violation of the whole scheme of our government," it is difficult to perceive why an order of that court, forbidding the chief law officer and all the district attorneys of a State to represent it in the courts, in a particular case, and practically, in that way, closing the doors of the state court against the State, would not also be inconsistent with the whole scheme of our government, and, therefore, beyond the power of the court to make.

Whether the Minnesota statutes are or are not violative of the Constitution is not, as already suggested, a question in this *habeas corpus* proceeding. I do not, therefore, stop to consider whether those statutes are repugnant to the Constitution upon the ground that by their necessary operation, when enforced, they will prevent the railway company from contesting their validity, or upon the ground that they are confiscatory and therefore obnoxious to the requirement of due process of law. While the argument at the bar in support of each of these propositions was confessedly of great force and persuasiveness, those points need not be now examined. I express no opinion about them. Their soundness may, however, be conceded for the purposes of this discussion. Indeed, it may be assumed for the purposes of this discussion that these state enactments are harsh and intemperate and, in some of their features, invalid. But those questions are wholly apart from the present proceeding. If we now consider them we must go out of our way in order to do so. We have no evidence in this proceeding, as to the effect which the statutes, if enforced, would have upon the value either of the railway property or of the bonds or stocks of the railway company. The question of their validity has not been finally decided by the Circuit Court, and we have not before us even the evidence upon which its preliminary injunction was based. The essential and only question now before us or that need be decided is whether an order by the Federal court which prevents the State from being represented in its own courts, by its chief law officer, upon an issue involving the constitutional validity of certain state enactments, does not make a suit against the State within the meaning of the Eleventh Amendment. If it be a suit of that kind, then, it is conceded, the Circuit Court was without jurisdiction to fine and imprison the petitioner and he must be discharged, whatever our views may be as to the validity of those state enactments. This must necessarily be so unless the Amendment has less force and a more restricted meaning now than it had at the time of its adop-

tion, and unless a suit against the Attorney General of a State, in his official capacity, is not one against a State under the Eleventh Amendment when its determination depends upon a question of constitutional power or right under the Fourteenth Amendment. In that view I cannot concur. In my opinion the Eleventh Amendment has not been modified in the slightest degree as to its scope or meaning by the Fourteenth Amendment, and a suit which, in its essence, is one against the State remains one of that character and is forbidden even when brought to strike down a state statute alleged to be in violation of that clause of the Fourteenth Amendment forbidding the deprivation by a State of life, liberty or property without due process of law. If a suit be commenced in a state court, and involves a right secured by the Federal Constitution, the way is open under our incomparable judicial system to protect that right, first, by the judgment of the state court, and ultimately by the judgment of this court, upon writ of error. But such right cannot be protected by means of a suit which, at the outset, is, directly or in legal effect, one against the State whose action is alleged to be illegal. That mode of redress is absolutely forbidden by the Eleventh Amendment and cannot be made legal by mere construction, or by any consideration of the consequences that may follow from the operation of the statute. Parties cannot, in any case, obtain redress by a suit *against the State.* Such has been the uniform ruling in this court, and it is most unfortunate that it is now declared to be competent for a Federal Circuit Court, by exerting its authority over the chief law officer of the State, without the consent of the State, to exclude the State, in its sovereign capacity, from its own courts when seeking to have the ruling of those courts as to its powers under its own statutes. Surely, the right of a State to invoke the jurisdiction of its own courts is not less than the right of individuals to invoke the jurisdiction of a Federal court. The preservation of the dignity and sovereignty of the States, within the limits of their constitutional powers,

is of the last importance, and vital to the preservation of our system of government. The courts should not permit themselves to be driven by the hardships, real or supposed, of particular cases to accomplish results, even if they be just results, in a mode forbidden by the fundamental law. The country should never be allowed to think that the Constitution can, in any case, be evaded or amended by mere judicial interpretation, or that its behests may be nullified by an ingenious construction of its provisions.

The importance of the question under consideration is a sufficient justification for such a reference to the authorities as will indicate the precise grounds on which this court has oftentimes proceeded when determining what is and what is not a suit against a State within the meaning of the Eleventh Amendment. All the cases agree in declaring the incapacity of a Federal court to exercise jurisdiction over a State as a party. But assaults upon the Eleventh Amendment have oftenest been made in cases in which the effort has been, without making the State a formal party, to control the acts of its officers and agents, by such orders directed to them as will accomplish, by indirection, the same results that could be accomplished by a suit directly against the State, if such a suit were possible. It will be well to look at some of the principal adjudged cases.

The general question was examined in *Cunningham* v. *Macon & Brunswick R. R. Co.*, 109 U. S. 446–451, where the court said that it was conceded in all the cases, and "may be accepted as a point of departure unquestioned, that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution." The court has not in any case departed from this constitutional principle. In *Pennoyer* v. *McConnaughy*, 140 U. S. 1, 9, it said that "this immunity of a State from suit is

absolute and unqualified, and the constitutional provision securing it is not to be so construed as to place the State within the reach of the process of the court. Accordingly, it is equally well settled that a suit against the officers of a State, to compel them to do the acts which constitute a performance by it of its contracts, is, in effect, a suit against the State itself." In *Cunningham* v. *Macon & Brunswick R. R. Co.*, just cited, the distinction was drawn between a suit in which the State is the real party in interest, although not technically a party on the record, and one in which "an individual is sued in tort for some act injurious to another in regard to person or property, to which his defense is that he has acted under the orders of the government;" in which last case, the court observed, the defendant "is not sued *as, or because he is,* the officer of the government, but as an individual, and the court is not ousted of jurisdiction because he *asserts* authority as such officer." Let it not be forgotten that the defendant Young was sued, not as an individual or because he had any personal interest in these matters, but *as, and solely because he is,* an officer of the State charged with the performance of certain public duties.

In *Hagood* v. *Southern*, 117 U. S. 52, 67, 68, which involved the validity of certain scrip alleged to have been issued by the State of South Carolina, it appeared that the State having denied its obligation to pay, the plaintiff sought relief by simply suing certain state officers, as such, without making the State a formal party. The court said; "These suits are accurately described as bills for the specific performance of a contract between the complainants and the State of South Carolina, who are the only parties to it. But to these bills the State is not in name made a party defendant, though leave is given to it to become such, if it chooses; and, except with that consent, it could not be brought before the court and be made to appear and defend. And yet it is the actual party to the alleged contract the performance of which is decreed, the one required to perform the decree, and the only

party by whom it can be performed. Though not nominally a party to the record, it is the real and only party in interest, the nominal defendants being the officers and agents of the State, having no personal interest in the subject-matter of the suit, and defending *only as representing the State.* And the things required by the decrees to be done and performed by them, are the very things, which when done and performed, constitute a performance of the alleged contract by the State. The State is not only the real party to the controversy, but the real party against which relief is sought by the suit, and the suit is, therefore, substantially within the prohibition of the Eleventh Amendment to the Constitution of the United States, which declares that 'the judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State.' " Again: "If this case is not within the class of those forbidden by the constitutional guaranty to the States of immunity from suits in Federal tribunals, it is difficult to conceive the frame of one which would be. If the State is named as a defendant, it can only be reached either by mesne or final process through its officers and agents, and a judgment against it could neither be obtained nor enforced, except as the public conduct and government of the ideal political body called a State could be reached and affected through its official representatives. A judgment against these latter, in their official and representative capacity, commanding them to perform official functions on behalf of the State according to the dictates and decrees of the court, is, if anything can be, a judicial proceeding against the State itself. If not, it may well be asked, what would constitute such a proceeding? In the present cases the decrees were not only against the defendants *in their official capacity,* but, that there might be no mistake as to the nature and extent of the duty to be performed, also against their successors in office." Is it to be said that an order requiring the Attorney General of a

State to perform certain official functions on behalf of the State is a suit against the State, while an order forbidding him, *as Attorney General*, not to perform an official function on behalf of the State is not a suit against the State?

The leading case upon the general subject, and one very similar in many important particulars to the present one, is *In re Ayers*, 123 U. S. 443, 496, 497, 505. The facts in that case were briefly these: The legislature of Virginia, in 1887, passed an act which holders of sundry bonds and tax-receivable coupons of that Commonwealth alleged to be in violation of their rights under the Constitution of the United States. They instituted a suit in equity in the Circuit Court of the United States against the Attorney General and Auditor of Virginia, and against the Treasurers and Commonwealth attorneys of counties, cities and towns in Virginia, the rel f asked being a decree enjoining and restraining the said state officers, and each of them, from bringing or commencing any suit provided for by the above act of 1887, or from doing anything to put that act into operation. The Circuit Court entered an order, enjoining the Attorney General of Virginia and each and all the state officers named "from bringing or commencing any suit against any person who has tendered the State of Virginia tax-receivable coupons in payment of taxes due to said State, as provided for and directed by the act of the legislature of Virginia, approved May 12, 1887." Subsequently the Circuit Court of the United States was informed that the Attorney General of Virginia had disobeyed its order of injunction. Thereupon that officer was ruled to show cause why he should not be fined and imprisoned. He responded to the rule, admitting that after being served with the injunction he had instituted a suit, in the state Circuit Court, against the Baltimore and Ohio Railroad Company to recover taxes due the State, and alleging "that he instituted the said suit because he was thereunto required by the act of the General Assembly of Virginia aforesaid, and because he believed this court had no jurisdiction whatever to award the injunction

violated." He disclaimed any intention to treat the court with disrespect, and stated that he had been actuated alone by the desire to have the law properly administered. He was, nevertheless, adjudged guilty of contempt, was required forthwith to dismiss the suit he had brought, was fined $500 for contempt of court, and committed *to the custody of the marshal* until the fine was paid, and until he purged himself of his contempt *by dismissing the suit in the state court.* The Attorney General then applied directly to this court for a writ of *habeas corpus,* which was granted, and upon hearing he was released by this court from custody. The order for his discharge recited that the suit in which the injunctions were granted was "in subscance and in law a suit against the State of Virginia," and "within the prohibition of the Eleventh Amendment to the Constitution;" that it was one "to which the judicial power of the United States does not extend;" that the Circuit Court was without jurisdiction to entertain it; that all its proceedings in the exercise of jurisdiction were null and void; that it had no authority or power to adjudge the Attorney General in contempt; and that his imprisonment was without authority of law. In the opinion in the *Ayers case* the court said: " It follows, therefore, in the present case, that the personal act of the petitioners sought to be restrained by the order of the Circuit Court, reduced to *the mere bringing of an action in the name of and for the State against taxpayers,* who, although they may have tendered tax-receivable coupons, are charged as delinquents, cannot be alleged against them as an individual act in violation of any legal or contract rights of such taxpayers." Again: " The relief sought is against the defendants, not in their individual, but *in their representative capacity as officers of the State of Virginia.* The acts sought to be restrained are the bringing of suits by the State of Virginia in its own name and for its own use. If the State had been made a defendant to this bill by name, charged according to the allegations it now contains—supposing that such a suit could be maintained—it would have been subject

to the jurisdiction of the court by process served upon its
Governor and Attorney General, according to the precedents
in such cases. *New Jersey* v. *New York*, 5 Pet. 284, 288, 290;
*Kentucky* v. *Dennison*, 24 How. 66, 96, 97; Rule 5 of 1884,
108 U. S. 574. If a decree could have been rendered enjoining
the State from bringing suits against its taxpayers, it would
have operated upon the State *only through the officers who by
law were required to represent it in bringing such suits, viz.,
the present defendants, its Attorney General, and the Common-
wealth's attorneys for the several counties.* For a breach of such
an injunction, these officers would be amenable to the court
as proceeding in contempt of its authority, and would be liable
to punishment thereof by attachment and imprisonment.
The nature of the case, as supposed, is identical with that of
the case as actually presented in the bill, with the single ex-
ception that the State is not named as a defendant. How else
*can the State be forbidden by judicial process to bring actions
in its name, except by constraining the conduct of its officers, its
attorneys, and its agents? And if all such officers, attorneys, and
agents are personally subjected to the process of the court, so as
to forbid their acting in its behalf, how can it be said that the
State itself is not subjected to the jurisdiction of the court as an
actual and real defendant?"* Further: " The very object and
purpose of the Eleventh Amendment were to prevent the
indignity of subjecting a State to the coercive process of
judicial tribunals at the instance of private parties. It was
thought to be neither becoming nor convenient that the sev-
eral States of the Union, invested with that large residuum
of sovereignty which had not been delegated to the United
States, should be summoned as defendants to answer the com-
plaints of private persons, whether citizens of other States
or aliens, or that the course of their public policy and the
administration of their public affairs should be subject to
and controlled by the members of judicial tribunals without
their consent, and in favor of individual interests. To secure
the manifest purposes of the constitutional exemption guaran-

teed by the Eleventh Amendment requires that it should be interpreted, not literally and too narrowly, but fairly, and with such breadth and largeness as effectually to accomplish the substance of its purpose. In this spirit it must be held to cover, not only suits brought against a State by name, but *those also against its officers, agents and representatives where the State, though not named as such, is nevertheless the only real party against which alone in fact the relief is asked, and against which the judgment or decree effectively operates.* But this is not intended in any way to impinge upon the principle which justifies suits against individual defendants, who, under color of the authority of unconstitutional legislation by the State, are guilty of *personal trespasses and wrongs,* nor to forbid suits against officers in their official capacity either to arrest or direct their official action by injunction or mandamus, where such suits are authorized by law, *and the act to be done or omitted is purely ministerial,* in the performance or omission of which the plaintiff has a legal interest."

It is said that the *Ayers case* is not applicable here, because the orders made by the Federal Circuit Court had for their object to compel Virginia to perform its contract with bondholders, which is not this case. But that difference between the *Ayers case* and this case cannot affect the principle involved. The proceeding against the Attorney General of Virginia had for its object to compel, by indirection, the performance of the contract which that Commonwealth was alleged to have made with bondholders—such performance, on the part of the State, to be effected by means of orders in a Federal Circuit Court directly controlling the official action of that officer. The proceeding in the Perkins-Shepard suit against the Attorney General of Minnesota had for its object, by means of orders in a Federal Circuit Court, directed to that officer, *to control the action of that State* in reference to the enforcement of certain statutes by judicial proceedings commenced in its own courts. The relief sought in each case was to control the State *by controlling the conduct of its law-officer,*

*against its will.* I cannot conceive how the proceeding against the Attorney General of Virginia could be deemed a suit against that State, and yet the proceeding against the Attorney General of Minnesota is not to be deemed a suit against Minnesota, when the object and effect of the latter proceeding was, beyond all question, to shut that State entirely out of its own courts, and prevent it through its law-officer from invoking their jurisdiction in a special matter of public concern, involving official duty, about which the State desired to know the views of its own judiciary. In my opinion the decision in the *Ayers case* determines this case for the petitioner.

More directly in point, perhaps, for the petitioner Young is the case of *Fitts* v. *McGhee,* 172 U. S. 516, 528, 529, 530. That suit was brought by the receivers of a railroad company against the Governor and Attorney General of Alabama. Its object was to prevent the enforcement of the provisions of an Alabama statute prescribing the maximum rates of toll to be charged on a certain bridge across the Tennessee River. The statute imposed a penalty for each time that the owners, lessees or operators of the bridge demanded or received any higher rate of toll than was prescribed by it. The relief asked was an injunction prohibiting the Governor and Attorney General of the State and all other persons from instituting any proceeding against the complainants, or either of them, to enforce the statute. An injunction, as prayed for, was granted. In the progress of the cause the solicitor of the district in which the case was pending was made a defendant and the injunction was extended to him. By amended pleadings it was made to appear that the tollgate keepers at the public crossing of the bridge were indicted for collecting tolls in violation of the statute. In the progress of the cause the plaintiffs dismissed the case as to the State, and the cause was discontinued as to the Governor. But the case was heard upon the motion to dismiss the bill upon the ground that the suit was one against the State in violation of the Constitution of the United States.

After stating the principles settled in the *Ayers case* and in other cases this court said: "If these principles be applied in the present case there is no escape from the conclusion that, although the State of Alabama was dismissed as a party defendant, this suit against its officers is really one against the State. *As a State can act only by its officers, an order restraining those officers from taking any steps, by means of judicial proceedings,* in execution of the statute of February 9, 1895, *is one which restrains the State itself, and the suit is consequently as much against the State as if the State were named as a party defendant on the record.* If the individual defendants held possession or were about to take possession of, or to commit any trespass upon, any property belonging to or under the control of the plaintiffs, in violation of the latter's constitutional rights, they could not resist the judicial determination, in a suit against them, of the question of the right to such possession by simply asserting that they held or were entitled to hold the property in their capacity as officers of the State. In the case supposed, they would be compelled to make good the State's claim to the property, and could not shield themselves against suit because of their official character. *Tindal v. Wesley,* 167 U. S. 204, 222. No such case is before us." Again, in the same case: "It is to be observed that neither the Attorney General of Alabama nor the Solicitor of the Eleventh Judicial Circuit of the State appear to have been charged by law with any special duty in connection with the act of February 9, 1895. In support of the contention that the present suit is not one against the State, reference was made by counsel to several cases, among which were *Poindexter* v. *Greenhow,* 114 U. S. 270; *Allen* v. *Baltimore & Ohio Railroad,* 114 U. S. 311; *Pennoyer* v. *McConnaughy,* 140 U. S. 1; *In re Tyler,* 149 U. S. 164; *Reagan* v. *Farmers' Loan & Trust Co.,* 154 U. S. 362, 388; *Scott* v. *Donald,* 165 U. S. 58, and *Smyth* v. *Ames,* 169 U. S. 466. Upon examination it will be found that the defendants in each of those cases were officers of the State, especially charged with the execution of a state enactment

alleged to be unconstitutional, but under the authority of
which, it was averred, they were committing or were about to
commit *some specific wrong or trespass* to the injury of the
plaintiff's rights. There is a wide difference between a suit
against individuals, holding official positions under a State,
to prevent them, under the sanction of an .unconstitutional
statute, from committing by some positive act a wrong or
trespass, and a *suit against officers of a State merely to test the
constitutionality of a state statute, in the enforcement of which
those officers will act only by formal judicial proceedings in the
courts of the State.* In the present case, as we have said, neither
of the state officers named held any special relation to the
particular statute alleged to be unconstitutional. They were
not expressly directed to see to its enforcement. If, because
they were law officers of the State, a case could be made for
the purpose of testing the constitutionality of the statute,
by an injunction suit brought against them, then the constitu-
tionality of every act passed by the legislature could be tested
by a suit against the Governor and Attorney General, based
upon the theory that the former as the executive of the State
was, in a general-sense, charged with the execution of all its
laws, and the latter, as Attorney General, might represent the
State in litigation involving the enforcement of its statutes.
That would be a very convenient way for obtaining a speedy
judicial determination of questions of constitutional law
which may be raised by individuals, but it is a mode which
cannot be applied to the States of the Union consistently with
the fundamental principle that they cannot, without their
assent, be brought into any court at the suit of private persons.
If their officers commit acts of trespass or wrong to the citi-
zen, they may be individually proceeded against for such
trespasses or wrong. Under the view we take of the question,
the citizen is not without effective remedy, when proceeded
against under a legislative enactment void for repugnancy
to the supreme law of the land; for, whatever the form of
proceeding against him, he can make his defense upon the

ground that the statute is unconstitutional and void. And that question can be ultimately brought to this court for final determination." I am unable to distinguish that case, in principle, from the one now before us. The *Fitts case* is not overruled, but is, I fear, frittered away or put out of sight by unwarranted distinctions.

Two cases in this court are much relied on to support the proposition that the Perkins-Shepard suit in the Circuit Court is not a suit against the State. I refer to *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, and *Smyth* v. *Ames*, 169 U. S. 466, 472. But each of those cases differs in material respects from the one instituted by Perkins and Shepard in the court below. In the *Reagan case* it appears that the very act, under which the railroad commission proceeded, authorized the railroad company, or any interested party, if dissatisfied with the action of the commission in establishing rates, to bring suit against that commission in any court, in a named county, with right to appeal to a higher court. This court when combatting the suggestion that only the state court had jurisdiction to proceed against the commission, and give relief in respect of the rates it established, said: " It may be laid down as a general proposition that, whenever a citizen of a State can go into the courts of a State to defend his property against the illegal acts of its officers, a citizen of another State may invoke the jurisdiction of the Federal courts to maintain a like defense. A State cannot tie up a citizen of another State, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts. Given a case where a suit can be maintained in the courts of the State to protect property rights, a citizen of another State may invoke the jurisdiction of the Federal courts. . . . It comes, therefore, within the very terms of the act. It cannot be doubted that a State, like any other government, can waive exemption from suit." The declaration of the court in the *Reagan case*, that that suit was not, within the true meaning of the Eleventh

Amendment, to be regarded as a suit against the State, must therefore be taken in connection with the declaration in the same case that the State having consented that the commission might be sued in one of its own courts, in respect of the rates established by the statute, must be taken to have waived its immunity from suit in the Circuit Court of the United States sitting in Texas. In *Smyth* v. *Ames*, above cited, which was a suit in a Circuit Court of the United States, involving the constitutional validity of certain rates established for railroads in Nebraska, it appeared that the statute expressly authorized any railroad company claiming that the rates were unreasonable to bring an action *against the State* before the Supreme Court in the name of the railroad company or companies bringing the same. Thus the State of Nebraska waived its immunity from suit, and having authorized a suit against itself in one of its courts, in respect of the rates there in question, it could not, according to the decision in the *Reagan case*, deny its liability to like suit in a court of the United States. It is true that this court, in its opinion in *Smyth* v. *Ames,* did not lay any special stress on the fact that Nebraska, by the statute, agreed that it might be sued, but it took especial care in its extended statement of the case to bring out that fact. Its silence on that point is not extraordinary, in view of the fact, as appears from the opinion of this court, that the question whether that suit was to be deemed one against the State was not discussed at the bar by the Nebraska State Board. We there quoted from the *Reagan case* these words: "Whenever a citizen of a State can go into the courts of a State to defend his property against the illegal acts of its officers, a citizen of another State may invoke the jurisdiction of the Federal courts to maintain a like defense. A State cannot tie up a citizen of another State, having property rights within its territory invaded by unauthorized acts of its own officers, to suits for redress in its own courts." That the *Reagan* and *Smyth cases* did not go as far as is now claimed for them is made clear by the later case of *Fitts* v. *McGhee*, already re-

ferred to, in which the doctrines of *In·re Ayers* were reaffirmed
and applied.

We may refer in this connection to *Gunter* v. *Atlantic Coast
Line*, 200 U. S. 273, 291, in which case one of the points made
was that the Circuit Court of the United States had no power
to restrain the Attorney General of South Carolina and the
counsel associated with him from prosecuting in the state
courts actions authorized by the laws of the State, and hence
that the court erred in awarding an injunction against said
officers. This court said: "Support for the proposition is
rested upon the terms of the Eleventh Amendment and the
provisions of section 720 of the Revised Statutes, forbidding
the granting of a writ by any court of the United States to
stay proceedings in any court of a State, except in cases where
such injunction may be authorized by any law relating to
proceedings in bankruptcy. The soundness of the doctrine
relied upon is undoubted. *In·re Ayers*, 123 U. S. 443; *Fitts*
v. *McGhee*, 172 U. S. 516. The difficulty is that the doctrine
is inapplicable to this case. Section 720 of the Revised Stat-
utes was originally adopted in 1793, whilst the Eleventh
Amendment was in process of formation in Congress for sub-
mission to the States, and long, therefore, before the ratifica-
tion of that Amendment. The restrictions embodied in the
section were, therefore, but a partial accomplishment of the
more comprehensive result affectuated by the prohibitions of
the Eleventh Amendment. Both the statute and the Amend-
ment relate to the power of courts of the United States to
deal, against the will and consent of a State, with controversies
between it and individuals. None of the prohibitions, there-
fore, of the Amendment or of the statute relate to the power
of a Federal court to administer relief in causes where juris-
diction as to a State and its officers has been acquired *as a
result of the voluntary action of the State in submitting its rights
to judicial determination*. To confound the two classes of cases
is but to overlook the distinction which exists between the
power of a court to deal with a subject over which it has

jurisdiction and its want of authority to entertain a contro-
versy as to which jurisdiction is not possessed."

Counsel for the railway company placed some reliance on
*Pennoyer* v. *McConnaughy*, 140 U. S. 1, 18, in which the previ-
ous cases on the general subject of suits against the States
were classified. That case was a suit in equity against certain
parties "who, under the constitution of Oregon, as Governor,
Secretary of State, and Treasurer of that State, comprised the
Board of Land Commissioners of that State, to restrain and
enjoin them from selling and conveying a large amount of
land in that State, to which the plaintiff asserted title." That
suit, in view of the nature of the relief asked, and of the rela-
tions of the defendants to the matters involved, was held not
to be one against the State within the meaning of the Eleventh
Amendment. But after a review of the facts the court, *as
explanatory of the conclusion reached by it*, took especial care
to observe: "In this connection it must be borne in mind that
this suit is not nominally against the Governor, Secretary of
State, and Treasurer, *as such officers*, but against them col-
lectively, as the board of land commissioners." The present
suit is, in terms, against Young "as Attorney General of
Minnesota," and the decree was sought against him, as such
officer, not against him individually, or as a mere adminis-
trative officer charged with certain duties.

One of the cases cited in support of the decision now ren-
dered is *Missouri, Kansas & Texas Railway Co.* v. *Missouri
R. R. & Warehouse Commissioners*, 183 U. S. 53, 58, 59. But
although that particular suit was held not to be one against
the State, the case, in respect of the principles announced by
the court, is in harmony with the views I have expressed.
For, the court there says: "Was the State the real party plain-
tiff? It was at an early day held by this court, construing
the Eleventh Amendment, that in all cases where jurisdic-
tion depends on the party, it is the party named in the record.
*Osborn* v. *United States Bank*, 9 Wheat. 738. But that technical
construction has yielded to one more in consonance with the

spirit of the Amendment, and in *In re Ayers*, 123 U. S. 443, it was ruled upon full consideration that the Amendment covers not only suits against a State by name *but those also against its officers, agents and representatives where the State, though not named as such, is nevertheless the only real party against which in fact the relief is asked, and against which the judgment or decree. effectively operates.* And that construction of the Amendment has since been followed." In the present case, the State, although not named on the record as a party, is the real party whose action it is sought to control.

There are other cases in this court in which the scope and meaning of the Eleventh Amendment were under consideration, but they need not be cited, for they are well known. They are all cited in *In re Ayers*, 123 U. S. 443, 500. "The vital principle in all such cases," this court said in the *Ayers case*, "is that the defendants, though professing to act as officers of the State, are threatening a violation of the personal or property rights of the complainant, for which they are personally and individually liable," or cases in which the officer sued refused to perform a purely ministerial duty, about which he had no discretion and in the performance of which the plaintiff had a direct interest. The case before us is altogether different. The statutes in question did not impose upon the Attorney General of Minnesota any special duty to see. to their enforcement. In bringing the mandamus suit he acted under the general authority inhering in him as the chief law officer of his State. He could not become personally liable to the railway company *simply because of his bringing the mandamus suit.* The Attorney General stated that all he did, or contemplated doing, was to bring the mandamus suit. The mere bringing of such a suit could not be alleged against him as an individual in violation of any legal right of the railway company or its shareholders. *In re Ayers,* 123 U. S. 443, 496. The plaintiffs recognized this fact and hence did not proceed in their suit upon the ground that the defendant was. individually liable. They sued him only as Attorney General,

and sought a decree against him in his official capacity, not otherwise.

Some reference has been made to *Ex parte Royall,* 117 U. S. 241, and other cases, that affirm the authority of a Federal court, under existing statutes, to discharge upon *habeas corpus* from the custody of a state officer one who is held in violation of the Federal Constitution for an alleged crime against a State. Those cases are not at all in point in the present discussion. Such a *habeas corpus* proceeding is *ex parte,* having for its object only to inquire whether the applicant for the writ is illegally restrained of his liberty. If he is, then the state officer holding him in custody is a trespasser, and cannot defend the wrong or tort committed by him, by pleading his official character. The power in a Federal court to discharge a person from the custody of a trespasser may well exist, and yet the court has no power in a suit before it, by an order directed against the Attorney General of a State, as such, to prevent the State from being represented by that officer, as a litigant in one of its own courts. The former cases, it may be argued, come within the decisions which hold that a suit which only seeks to prevent or restrain a trespass upon property or person by one who happens to be a state officer, but is proceeding in violation of the Constitution of the United States, is not a suit against a State within the meaning of the Eleventh Amendment, but a suit against the trespasser or wrongdoer. But the authority of the Federal court to protect one against a trespass committed or about to be committed by a state officer in violation of the Constitution of the United States is very different from the power now asserted, and recognized by this court as existing, to shut out a sovereign State from its own courts by the device of forbidding its Attorney General, under the penalty of fine and imprisonment, from appearing in such courts in its behalf. *The mere bringing of a suit on behalf of a State, by its Attorney General,* cannot (this court has decided in the *Ayers case*) make that officer a trespasser and individually liable to the

party sued. To enjoin him from representing the State in such suit is therefore, for every practical or legal purpose, to enjoin the State itself. This court, in the *Debs Case*, 158 U. S. 564, 584, said: "Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter. The obligation which it is under to promote the interest of all, and to prevent the wrongdoing of one resulting in injury to the general welfare, is often of itself sufficient to give it a standing in court. This proposition in some of its relations has heretofore received the sanction of this court." If there be one power that a State possesses, which ought to be deemed beyond the control, in any mode, of the National Government or of any of its courts, it is the power *by judicial proceedings* to appear in its own courts, by its law-officer or by attorneys, and seek the guidance of those courts in respect of matters of a justiciable nature. If the state court, by its judgment, in such a suit, should disregard the injunctions of the Federal Constitution, that judgment would be subject to review by this court upon writ of error or appeal.

It will be well now to look at the course of decisions in other Federal courts.

Attention is first directed to *Arbuckle* v. *Blackburn*, 113 Fed. Rep. 616, 622, which was a suit in equity, one of the principal objects of which was to restrain the enforcement of an act of the Ohio legislature relating to food products, particularly of a named coffee in which the plaintiffs were interested. The Circuit Court of Appeals held that the bill was properly dismissed, saying, among other things: "What, then, is the object of the injunction sought in this case? It is no more or less than to restrain the officer of the State from bringing prosecutions for violations of an act which said offi-

cer is expressly charged to enforce in the only way he is au-
thorized to proceed—by bringing criminal prosecutions in the
name of the State. This is virtually to enjoin the State from
proceeding through its duly qualified and acting officers. If
the food commissioner may be enjoined from instituting such
prosecutions, why may not the prosecuting attorney, or any
officer of the State charged with the execution of the criminal
laws of the State? While the State may not be sued, if the bill
can be sustained against its officers, it is as effectually pre-
vented from proceeding to enforce its laws as it would be by
an action directly against the State. This view of the case,
in our judgment, is amply sustained by the cases above cited,
and by the later case of *Fitts* v. *McGhee*, 172 U. S. 516. In so
far as this action seeks an injunction against the respondent
from proceeding to enforce by prosecution the provisions of the
statutes of Ohio above cited, the courts of the United States
are deprived of jurisdiction by the Eleventh Amendment to
the Constitution."

In *Union Trust Co.* v. *Stearns*, 119 Fed. Rep. 790, 791, 792,
795, the Circuit Court of the United States for the District of
Rhode Island had occasion to consider the scope of the Eleventh
Amendment. The case related to a statute regulating the
hours of labor of certain employés of street railways, and im-
posing a fine for a violation of its provisions. The court upon
an elaborate review of all the cases in this court dismissed the
action. The defendants Stearns and Greenough were, respec-
tively, the Attorney General and Assistant Attorney General of
the State. They were not named in the act, nor charged with
any special duty in connection therewith. The court said:
"The purpose of the present bill, in substance and effect, is
to enjoin the State of Rhode Island from the enforcement of
a penal statute. Indictments under the act are brought in
the name and on behalf of the State for the protection of the
State. These defendants, the Attorney General and his as-
sistant, merely represent the State in such proceedings. They
are simply the officers and agents of the State. It is not as

individuals, but solely by virtue of their holding such offices, that they prefer and prosecute indictments in the name of the State. A State can only act or be proceeded against through its officers. If a decree could be entered against the State of Rhode Island enjoining prosecutions under this act, it could only operate against the State through enjoining these defendants. An order restraining the Attorney General and his assistant from the enforcement of this statute is an order restraining the State itself. The present suit, therefore, is as much against the State of Rhode Island as if the State itself were named a party defendant." After referring to *In re Ayers,* and *Fitts* v. *McGhee,* and upon a review of the cases, the court proceeded: "The defendants Stearns and Greenough hold no special relation to the act of June 1, 1902. They are not specially charged with its execution. They are not thereby constituted a board or commission with administrative powers, nor are they as individuals, and apart from the official authority under which they act, threatening to seize the property of the complainant, or to commit any wrong or trespass against its personal or property rights. They have no other connection with this statute than the institution of formal judicial proceedings for its enforcement in the courts of the State in the name and behalf of the State. Upon reason and authority the present bill is a suit against the State of Rhode Island, within the meaning of the Eleventh Amendment to the Constitution of the United States."

In *Morenci Copper Co.* v. *Freer,* 127 Fed. Rep. 199, 205, which was an action in equity to restrain and inhibit the defendant, in his official capacity as Attorney General of West Virginia, from proceeding to institute an action in the state court for forfeiture of the charter of the plaintiff corporation for a failure to pay a license tax imposed by a state statute, and which statute was alleged to be in violation of the Federal Constitution, the Circuit Court reviewed the decisions of this court upon the question as to what were and what were not suits against the State. The Circuit Court held that it had no juris-

diction of the case, saying: "But it may be said, if the court holds that no remedy of this sort will lie in the Circuit Court of the United States to prevent this breach of a contract by the State of West Virginia by means of the machinery of a law violative of the Constitution of the United States, how are the rights of corporations to be preserved? The answer is that such alleged unconstitutionality is matter of defense to any suit brought for the forfeiture of complainant's charter, and could be set up as an answer and defense to any bill brought for that purpose, and, if the highest court of the State ruled adversely to that contention, appeal would lie to the Supreme Court of the United States. Or the case can be removed to the Circuit Court of the United States if it presents a case arising under the Constitution or laws of the United States."

A well-considered case is that of *Western Union Tel. Co.* v. *Andrews*, 154 Fed. Rep. 95, 107. In that case the telegraph company sought by bill, to enjoin the prosecuting attorneys of the various judicial circuits of Arkansas from instituting any proceeding for penalties for its failure or refusal to comply with the provisions of an act of the legislature of Arkansas relating to foreign corporations doing business in that State and fixing fees, etc. The bill charged that the various prosecuting attorneys would, unless restrained, institute numerous actions for the recovery of the penalties prescribed by the act, which was no less than $1,000 for each alleged violation. The defense was, among other things, that the action was one against the State, and, therefore, prohibited by the Constitution. After a careful review of the adjudged cases in this court and in the subordinate Federal courts, the Circuit Court held the action to be one against the State, forbidden by the Eleventh Amendment, saying among other things: "The allegations in the bill show that this is an attempt to prevent the State of Arkansas, through its officers, who by its laws are merely its attorneys, to represent it in all legal actions in its favor or in which it is interested, from instituting and prosecuting suits for the recovery of penalties incurred for alleged

violation of its laws, actions which can only be instituted in the name of the State and for its use and benefit."

Upon the fullest consideration and after a careful examination of the authorities, my mind has been brought to the conclusion that no case heretofore determined by this court requires us to hold that the Federal Circuit Court had authority to forbid the Attorney General of Minnesota from representing the State in the mandamus suit in the state court, or to adjudge that he was in contempt and liable to be fined and imprisoned simply because of his having, as Attorney General, brought that suit for the State in one of its courts. On the contrary, my conviction is very strong that, if regard be had to former utterances of this court, the suit of Perkins and Shepard in the Federal court, in respect of the relief sought therein against Young, in his official capacity, as Attorney General of Minnesota, is to be deemed—under the *Ayers* and *Fitts cases* particularly—a suit against the State of which the Circuit Court of the United States could not take cognizance without violating the Eleventh Amendment of the Constitution. Even if it were held that suits to restrain the instituting of actions directly to recover the prescribed penalties would not be suits against the State, it would not follow that we should go further and hold that a proceeding under which the State was, in effect, denied access, by its Attorney General, to its own courts, would be consistent with the Eleventh Amendment. A different view means, as I think, that although the judicial power of the United States does not extend to any suit expressly brought against a State by a citizen of another State without its consent or to any suit the legal effect of which is to tie the hands of the State, although not formally named as a party, yet a Circuit Court of the United States, in a suit brought against the Attorney General of a State may, by orders directed specifically against that officer, control, entirely control, by indirection, the action of the State itself in judicial proceedings in its own courts involving the constitutional validity of its statutes. This court has heretofore held that

that could not be done, and that such a result would, for most purposes, practically obliterate the Eleventh Amendment and place the States, in vital particulars, as absolutely under the control of the subordinate Federal courts, as if they were capable of being directly sued. I put the matter in this way, because to forbid the Attorney General of a State (under the penalty of being punished as for contempt) from representing his State in suits of a partiular kind, in its own courts, is to forbid the State itself from appearing and being heard in such suits. Neither the words nor the policy of the Eleventh Amendment will, under our former decisions, justify any order of a Federal court the necessary effect of which will be to exclude a State from its own courts. Such an order attended by such results cannot, I submit, be sustained consistently with the powers which the States, according to the uniform declarations of this court, possess under the Constitution. I am justified, by what this court has heretofore declared, in now saying that the men who framed the Constitution and who caused the adoption of the Eleventh Amendment would have been amazed by the suggestion that a State of the Union can be prevented by an order of a subordinate Federal court from being represented by its Attorney General in a suit brought by it in one of its own courts; and that such an order would be inconsistent with the dignity of the States as involved in their constitutional immunity from the judicial process of the Federal courts (except in the limited cases in which they may constitutionally be made parties in this court) and would be attended by most pernicious results.

I dissent from the opinion and judgment.

*Dissent.*